JOHN W. SEAMAN, JR., AND BETTYE H. SEAMAN, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1235–81—1239–81,     Filed April 2, 1985.
1596–81, 1598–81.

---

[1]Cases of the following petitioners are consolidated herewith: Bruce A. Samson and Adajean L. Samson, docket No. 1236–81; Harold G. Nix, docket No. 1237–81; Richard F. Lockey and Anne S. Lockey, docket No. 1238–81; William J. Schifino and Lois A. Schifino, docket No. 1239–81; Edward Hoornstra and Mildred Hoornstra, docket No. 1596–81; and Charles A. Kottmeier and Eloise L. Kottmeier, docket No. 1598–81.

*Elliot I. Miller* and *Richard S. Kestenbaum*, for the petitioners.

*Patricia A. Donahue* and *John Ferrante* for the respondent.

STERRETT, *Judge*: Respondent issued statutory notices of deficiency in these consolidated cases that determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 1235–81 | John W. Seaman, Jr., | 1976 | $43,451.00 |
|  | and Bettye H. Seaman | 1977 | 3,342.98 |
| 1236–81 | Bruce A. Samson | 1976 | 130,035.80 |
|  | and Adajean L. Samson | 1977 | 7,874.98 |
| 1237–81 | Harold G. Nix | 1976 | 43,343.00 |
|  |  | 1977 | 2,624.16 |
| 1238–81 | Richard F. Lockey | 1976 | 29,682.70 |
|  | and Anne S. Lockey |  |  |

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 1239–81 | William J. Schifino and Lois A. Schifino | 1976 | $28,062.70 |
| 1596–81 | Edward Hoornstra and Mildred Hoornstra | 1976 | 29,346.19 |
| 1598–81 | Charles A. Kottmeier and Eloise L. Kottmeier | 1976 | [2]20,908.25 |

The ultimate issue for decision is the amount, if any, that petitioners, as limited partners, are entitled to deduct as their distributive shares of the losses claimed during the years in question by the Knox County Partners, Ltd. (the partnership). Specific issues posed by the parties include the following:

(1) Whether the coal mining activity of the partnership was an activity engaged in for profit;

(2) Whether, and if so to what extent, are the advanced royalties claimed by the partnership deductible for the 1976 taxable year;

(3) Whether petitioners in docket Nos. 1235–81, 1236–81, and 1237–81 are entitled to deduct their distributive shares of interest expense claimed by the partnership for the 1977 taxable year; and

(4) Whether petitioners in docket Nos. 1235–81, 1236–81, and 1237–81 are entitled to deduct their distributive shares of "cost of goods—development costs" claimed by the partnership for the 1977 taxable year.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

All of the petitioners herein were residents of Florida at the time their petitions were filed. The income tax returns for the periods involved were filed by each of the petitioners with the

---

[2]The parties in the following docketed cases have agreed to be bound by the final decision in these consolidated cases: Lewis J. Hirsch and Suzanne L. Hirsch, docket No. 13500–80; Frank N. Fleischer and Barbara C. Fleischer, docket Nos. 1234–81 and 1077–83; Stanley Rosewater and Maureen Rosewater, docket No. 1597–81; Lawrence Goodwin and Nancy Goodwin, docket No. 12541–81; Ralph S. Glover and Ruth Glover, docket No. 24583–81; Samuel S. Wexler and Charlene Wexler, docket No. 27941–81; Edward N. Hoornstra and Mildred S. Hoornstra, docket No. 20530–82; Ronald R. Willey and Luanne Willey, docket No., 27188–82; and Samuel L. Winer and Judith Winer, docket No. 29243–83.

Office of the Internal Revenue Service at Chamblee, Georgia. All of the determined deficiencies in these cases are attributable to petitioners' participation, as limited partners, in the Knox County Partners, Ltd., a limited partnership organized and operated for the avowed purpose of exploiting certain coal rights.

Knox County Partners, Ltd., was organized through the joint efforts of Ralph Musicant, Michael Glantz, Carl Anderson, and Samuel Winer. Ralph Musicant is a graduate of Northwestern University, from which he received his Bachelor of Arts degree in 1968, and of Harvard Law School, from which he received his Juris Doctorate in 1971. After he graduated from law school, Musicant practiced tax and securities law, first with a firm in Illinois and later with a firm in Florida. Subsequently, he became a vice president of acquisitions and general counsel of a real estate investment firm. He then became a visiting professor of finance at the Northwestern University Graduate School of Management. In the spring of 1976 Musicant began working, as director of real estate and assistant general counsel, for Financial Analytics Corp. (Finalco), an equipment leasing firm. Prior to that time, Musicant could boast of no background in the coal mining industry. By his own admission, his prior work history largely involved the structuring of tax shelters.

It was as an employee of Finalco that Musicant first became involved in the transactions that eventually led to this litigation. During the early summer of 1976, Musicant began to investigate the coal industry as an area for expansion by Finalco. In his efforts to learn about the industry, Musicant talked to an accountant in Florida who informed him that one Michael Glantz had been involved in the coal business. Glantz's experience in the coal industry began in 1975 or 1976 when some people he knew approached him with respect to joining them in a strip mining venture. In late August or early September 1976, Musicant contacted Glantz and set up a meeting to discuss the coal mining business. The meeting was held the following day in Finalco's offices in Vienna, Virginia, and was attended by Musicant, Jack Olmstead, who was vice president of Finalco, Glantz, and Carl Anderson. Anderson was Glantz's partner in at least one coal mining venture in Kentucky. Glantz indicated that American Coal & Coke, Inc.

(American Coal & Coke), of Nashville, Tennessee, had a substantial number of coal leases, and the parties agreed to a mutual meeting with the principals of that corporation.

Thereafter, Glantz set up the meeting with American Coal & Coke. The meeting was held at the offices of American Coal & Coke in early September 1976 and was attended by Musicant, Olmstead, Glantz, Anderson, and various officers of American Coal & Coke, Cliff E. Hooper, Reginald Keene, Raymond Rhodes, and John Ozier. During the meeting, which lasted the better part of the day, the attendees discussed such matters as the nature of American Coal & Coke's involvement in the coal mining business, the sums necessary to open up a mine, the type of mining equipment that should be used, and the manner in which a possible deal might be structured. The name "American Blue Gem Coal Co., Inc." (American Blue Gem) was mentioned in the course of the conversation as a mining corporation that performed functions for American Coal & Coke.

Shortly after the meeting in Nashville, Musicant resigned from Finalco. The reason for the resignation was a dispute with Olmstead, who allegedly wanted to cut Glantz and Anderson out of any forthcoming deal that might be reached between Finalco and American Coal & Coke. Musicant then got in touch with Glantz to inform the latter that he had resigned from Finalco. It was agreed that Musicant would join Glantz and Anderson in an effort to structure a deal with American Coal & Coke.

In early October, Musicant and Glantz flew to Nashville to meet again with the principals of American Coal & Coke for purposes of discussing a possible sublease of mineral property.[3] The lease under inquiry was known as the Detherage lease. At this juncture the property in question was described by American Coal & Coke as an approximately 2,600-acre piece of property located in Knox County, Kentucky, and containing Blue Gem coal, the highest quality coal available. It was represented that the property was worth $2 million and that it would cost $400,000 to open a mine. The parties

---

[3]It so happened that Olmstead was on the same flight and also had arranged a meeting with American Coal & Coke. He met separately with representatives of the corporation; however, after this point Finalco dropped out of the picture. Apparently no deal was reached between American Coal & Coke and Finalco.

pursued discussions regarding the structuring of the deal, particularly the use of an advanced royalty. Musicant believed that use of an advanced royalty would maximize the tax benefits to all participants. It was decided that the advanced royalty would be in the amount of $1,825,000. The deal agreed upon was that Glantz, Anderson, and the investors would supply the capital and that American Coal & Coke would run the business. It was contemplated that an affiliate of American Coal & Coke, American Blue Gem, would assume the role of the contract miner of the property. Unbeknownst to Musicant, and apparently Glantz and Anderson as well, American Blue Gem was not at this time an existing corporation. Musicant and Glantz explained that they would need until the end of December to raise money for the venture from outside investors. The parties, therefore, agreed to a $50,000 liquidated damages figure in the event that a sufficient number of investors could not be located by December 31, 1976.

Sometime in early October, Glantz and Anderson formed the Knox County Partners, Ltd. Glantz was the initial general partner and Anderson was the initial limited partner. Musicant was requested to prepare a limited partnership certificate and agreement. The certificate, with attached agreement, was signed and notarized on October 10, 1976. The principal place of business of the partnership was 3428 Lakewood Road, Tampa, Florida, which was Glantz's home address. American Coal & Coke also made some space available to the partnership in its offices in Nashville.

On October 15, 1976, a lease agreement was entered into between American Coal & Coke, as "lessor," and Knox County Partners, Ltd., as "lessee," entitling the lessee to mine and produce coal from the Blue Gem seams of coal on the Detherage property. The term of the lease was stated to be for such period of time as might be necessary to mine and remove the commercially minable Blue Gem seams of coal on the property. However, it was agreed that, if at any time further mining operations on the leased premises were not economically justifiable, the lessee, upon notice to the lessor and provided that the lessee was not in default on any of its obligations under the lease, could terminate the lease and preclude the accrual of any further obligations of the lessee under the lease. Under the terms of the lease, the lessee

agreed, inter alia, to submit to the lessor a plan for the course of development of the property and to submit annual reports with respect to the course of development of the mine; to commence mining operations not later than May 1, 1977; to employ a competent registered engineer to prepare surveys, maps, etc.; and to keep accurate books of account with respect to all coal mined. In addition, the lease contained the following provisions concerning the payment of royalties:

*Royalties*: (a) LESSEE shall pay to LESSOR a minimum royalty annually throughout the term of this lease in the amount of Two Hundred Thousand ($200,000.00) dollars per annum. However, LESSOR recognizes that time will be required to commence operations and hereby agrees that such minimum royalty shall not commence until May 1, 1977 and shall be prorated based upon a full calendar year. (b) LESSEE shall pay to LESSOR a tonnage royalty on all merchantable coal mined, as follows: The sum of Two Dollars and Ten Cents ($2.10), for each net ton of 2,000 pounds of merchantable coal mined and sold.

*     *     *     *     *     *     *

(c) LESSEE shall pay an advance minimum royalty in the amount of One Million Eight Hundred Twenty-Five Thousand ($1,825,000.00) Dollars in cash and nonrecourse promissory notes on or before December 31, 1976. If LESSEE does not fulfill its obligation hereinabove, to wit, to pay LESSOR such advance minimum royalty by December 31, 1976 then LESSOR will accept such $50,000.00 as liquidated damages for LESSEE'S non-performance. Such $50,000.00 to be evidenced by LESSEE'S promissory note, Number 2, dated October 15, 1976 attached hereto.

The lease specifically stated that the royalties would be treated and considered as rent reserved for the leased premises. It was agreed that the lessor would retain a lien for such rent upon the lessee's improvements and property located on the leased premises, as well as upon the leasehold estate.

The property covered by the foregoing lease was originally leased by American Coal & Coke on September 28, 1976, from Ed Detherage, as president of White Log Jellico Coal Co., Inc. American Coal & Coke was obligated to pay Detherage a tonnage royalty of $0.70 for each net ton of 2,000 pounds of merchantable coal mined and was further obligated to pay Detherage a minimum coal royalty of $250 per month.

Subsequent to the execution of the lease agreement between Knox County Partners, Ltd., and American Coal & Coke, it was agreed between Musicant, Glantz, and Anderson that,

through his corporation, RCM Associates, Inc. (later to be known as Reserve Associates, Inc.), Musicant would join Glantz as a general partner in Knox County Partners, Ltd. In addition, there would be two more general partners, the Anderson Family Trust, of which Carl Anderson was the trustee, and Samuel L. Winer. By letter dated November 27, 1976, it was agreed that Winer would attempt to raise $600,000 from the sale of limited partnership interests in the partnership.

At the time that the lease agreement between Knox County Partners, Ltd., and American Coal & Coke was signed, no other agreements between the parties were in effect, and the partners, particularly Musicant, set themselves to the task of arranging various collateral agreements with American Coal & Coke. In addition, the partners began to do some research into the background of the corporation and the nature of the leased premises.

In the process of investigating the background of American Coal & Coke, Glantz checked with references provided by the corporation and with a "couple of miners" who were selling coal through the corporation. Those references met with Glantz's satisfaction. However, he did not verify the résumés of the corporate officers that were subsequently included in the partnership's offering memorandum. He also did not ask to examine any books and records or tax returns of the corporation. Furthermore, he never attempted to determine whether there were any judgments against the corporation or whether any of the corporation's assets were encumbered. The research undertaken by the partners generally revealed that the corporation was not as strong as it originally had appeared.

In early November 1976, Glantz, on behalf of the partnership, engaged the services of Gary R. Cummings of Cummings, Binkley & Associates, Inc., to prepare an engineering report and coal reserve estimate on the Detherage tract. Cummings, whose services had been recommended by Cliff Hooper of American Coal & Coke, was a surveyor, but he was not a mining engineer. The report estimated the existence of approximately 7,444,286 tons of Blue Gem coal on the acreage purportedly leased (approximately 2,600 acres), of which 5,211,000 tons were estimated to be recoverable by deep

mining, using a 70-percent recovery factor. The report specifically stated that "Inasmuch as the coal reserves are estimated, it is recommended that core drilling as per standard procedure be utilized to verify and prove the reserves."

On December 1, 1976, the charter of American Blue Gem was registered and certified by the State of Tennesse. Apparently, the initial shareholders of the corporation were Hooper, Keene, Rhodes, and Ozier of American Coal & Coke. At least one, if not all, of the general partners was unaware of the fact that American Blue Gem was a newly formed entity.

By a private placement memorandum (offering memorandum), dated December 2, 1976, Knox County Partners, Ltd., sought subscriptions for a maximum of 20-limited-partnership units at $30,000 per unit. It was noted that of the proceeds of the offering, all sums would be applied toward payment of the "advanced minimum royalty," with the exception of $15,000, which would be retained as working capital. It was further noted that American Coal & Coke would pay $185,000 of the $585,000 cash portion of the advanced royalty to the general partners as a consulting fee.

The offering memorandum informed potential investors that the partnership had executed a sublease with American Coal & Coke, pursuant to which the partnership had obtained the coal rights to mine the Blue Gem seam of coal on the approximately 2,600 acres covered by the sublease. It further informed investors that the sublease called for a $200,000-per-year minimum royalty and that $1,825,000 of the "advanced minimum royalty" would be paid on the closing date, $585,000 in cash and $1,240,000 by the execution of a nonrecourse note. The note, which was to bear interest at the rate of 6-percent per annum, would be dated the closing date and would be due May 1, 1986. Principal and interest payments were to be paid quarterly. The offering memorandum explained that the note would be wholly without recourse to any partner and that the sole remedy of American Coal & Coke in the event of default was to terminate the sublease. Recoupment of the "advanced minimum royalty" of $1,825,000 was to occur at the rate of $2 per ton of coal mined and sold and was to continue until 912,500 tons had been mined and sold.

The offering memorandum also described the general nature of the mining contract that the partnership would

execute with American Blue Gem as contract miner of the leased premises. The memorandum stated that American Coal & Coke and American Blue Gem, in conjunction, would determine the type of mining equipment to be used on the premises. It was represented that American Blue Gem would guarantee the mining of 100,000 tons per year and that the partnership, in turn, would pay American Blue Gem a base price of $17 per ton for each ton mined and sold. The base price was subject to escalation. It was further represented that, in the event that American Blue Gem was unable to satisfy its guarantee to mine 100,000 tons per year, thereby resulting in the partnership's inability to pay the portion of the advanced royalty represented by the nonrecourse note, American Blue Gem would be obligated to pay the partnership liquidated damages in an amount sufficient to amortize the note. It was specifically contemplated that the liquidated damages could be paid in the form of promissory notes executed by American Blue Gem, and it was represented that American Coal & Coke had agreed to accept such notes in lieu of any payments to be applied as credits against the partnership's note to American Coal & Coke.

The offering memorandum set forth a substantial number of risk factors inherent in the investment. It was noted that there could be no assurances made with respect to the coal reserves; that coal prices had peaked in 1974 and 1975 and had declined since that time; that the general partners had little experience in the operation of a coal mining business; that certain potential conflicts of interest existed; and that there was no assurance that the contract cost of American Blue Gem's services would be maintained at the initial contract price and no assurance that American Blue Gem would be financially responsible with respect to its guarantee.

A substantial portion of the offering memorandum was devoted to a discussion of the tax aspects of the transaction. In addition, a generally favorable tax opinion prepared by Robert M. Levin, Esq., was attached to the offering memorandum. Levin was a friend of Musicant's, with whom Musicant shared office space upon his return to Chicago, after leaving the employ of Finalco. The offering memorandum noted that there were substantial tax risks associated with an investment in the partnership and cautioned that "Since so-called 'tax

shelters' are generally under attack by the Internal Revenue Service, it is reasonable to expect that upon an audit, the Internal Revenue Service may differ with legal Counsel in the application of the Internal Revenue Code to the Partnership."

In addition to the tax opinion, various other exhibits were attached to the offering memorandum, including, for example, a copy of the amended and restated partnership agreement, financial projections prepared by Musicant from information provided by American Coal & Coke, the engineering report and coal reserve estimate prepared by Cummings, and résumés of the principals of American Coal & Coke and American Blue Gem.

On December 2, 1976, the partnership, American Coal & Coke, American Blue Gem, and American Coal & Coke's attorney, as escrow agent, entered into an escrow agreement, whereby the parties agreed to deposit with the escrow agent executed copies of a coal mining agreement between the partnership and American Blue Gem, coal brokerage and coal purchase agreements between the partnership and American Coal & Coke, and a joint agreement between the partnership, American Coal & Coke, and American Blue Gem. These documents were to be released to the parties upon the receipt by American Coal & Coke of the advanced royalty payment called for by the lease agreement dated October 15, 1976. The documents were to be of no force and effect in the event that the advanced royalty payment was not made on or before December 31, 1976.

As contemplated in the offering memorandum, pursuant to the terms of the executed mining agreement, American Blue Gem guaranteed that it would mine or cause to be mined a minimum of 100,000 tons of coal per year, beginning May 1, 1977, and continuing throughout the term of the agreement. In return, the partnership agreed to pay American Blue Gem, subject to adjustments, the sum of $17 for each ton of coal so mined. The term of the agreement was to be for an initial period of 10 years and could thereafter be extended at the option of American Blue Gem. However, if either party failed to perform any of its obligations set forth in the agreement, the nondefaulting party was granted the right to terminate the agreement.

The agreement jointly executed by the partnership, American Coal & Coke, and American Blue Gem elaborated on the latter corporation's minimum mining guarantee and set forth the following provisions with respect to the payment of liquidated damages on the failure to satisfy the guarantee:

If the Miner [American Blue Gem] in any month after May 1, 1977, should fail to mine coal under the Mining Contract for any reason other than as may be set forth in paragraph 12 (the Force Majeure provision) of the Mining Contract, it shall pay to the Lessee [Knox County Partners, Ltd.] as liquidated damages for such failure the sum of $16,666 on the last day of such month.

&#42; &#42; &#42; Payments which may be required of the Miner under paragraphs 1 and 2 hereof to the Lessee may be made at the election of the Miner in either cash or non-interest bearing negotiable promissory notes payable to the Lessor (American Coal & Coke, Inc.).

&#42; &#42; &#42; The Lessor by the execution hereof agrees to accept from the Lessee without recourse any promissory notes received by Lessee from the Miner pursuant to this Agreement and Lessor shall apply such promissory notes as credits against the Lessee's obligations under the Lease and Note.

Pursuant to the coal brokerage agreement executed on December 2, 1976, the partnership appointed American Coal & Coke as its exclusive agent for the sale of coal. The corporation would receive an escalating commission for its brokerage services, the amount of which was dependent upon the amount of the gross proceeds from coal sales. Pursuant to the coal purchase agreement also executed on December 2, 1976, the partnership generally agreed to sell, and American Coal & Coke generally agreed to buy, 75,000 net tons of coal per year at a price of $21.50 per net ton for a period of 2 years.

At some time after the offering memorandum was prepared and the escrow agreement signed, the partnership had a title report prepared on the Detherage tract. That report disclosed a problem with respect to the title on over 1,000 acres of the land. At that juncture, the partners presented the matter to Chicago Title Insurance Co. and were able to obtain a title insurance policy with respect to 1,100 acres of the Detherage tract. After he learned of the title defect on the Detherage tract, Musicant approached American Coal & Coke and requested that an additional property be added to the lease. Thereafter, on December 28, 1976, the lease agreement was amended to add an additional property known as the Jones property. The lease was again amended on December 30, 1976,

making it clear that the royalty provisions contained in the original lease were not to apply to the Jones property. On December 31, 1976, an agreement was entered between the partnership and American Blue Gem providing that American Blue Gem had the option of extending the mining agreement of December 2, 1976, to cover the Jones property.[4]

On December 31, 1976, the partnership, American Coal & Coke, and American Blue Gem entered into an agreement whereby the former corporation agreed to loan the latter corporation the sum of $206,000 for purposes of establishing the initial mining operations on the property leased by the partnership. By the same agreement, the parties agreed that all decisions with respect to the establishment of the initial mining operations would rest solely within the discretion of American Coal & Coke or American Blue Gem. The amount of the loan of $206,000 from American Coal & Coke was almost 100 percent less than the amount originally stated by the corporation to be necessary for purposes of opening the mine.

The limited partners of the partnership were not located until sometime in December 1976, and the record fails to disclose the exact date of their entry into the partnership. However, although at least one of the general partners, Musicant, had lost faith in American Coal & Coke by the end of December, the partnership nevertheless consummated the deal with American Coal & Coke by the originally contemplated closing date, December 31, 1976. On that date, a check in the amount of $585,000 was issued by the partnership to American Coal & Coke as payment of the cash portion of the advanced royalty. In addition, the partnership executed a nonrecourse promissory note in the amount of $1,240,000, representing the balance of the advanced royalty payable on or before December 31, 1976. By its terms, the note bore interest at the rate of 6 percent per annum beginning May 1, 1977. The note provided that American Coal & Coke's sole remedy on default would be the eviction of the partnership from the subleasehold created by the lease agreement between American Coal & Coke and the partnership dated October 15, 1976, as amended. In a separate agreement dated December

---

[4]An undated Errata Addendum to the partnership's offering memorandum included an amended engineering and coal reserve estimate for the portion of the Detherage tract on which the partnership had secured valid title and a reserve estimate for the Jones tract.

31, 1976, the partnership granted American Coal & Coke a security interest in the partnership's leasehold interest, and American Coal & Coke agreed that the partnership would never be personally liable for any money damages in the event of default in the payment of the $1,240,000 promissory note. The entire amount of the cash and note turned over to American Coal & Coke on December 31, 1976, was intended by the partnership to represent a royalty payment and no portion of the total was allocable to a turnkey agreement.

Subsequent to the consummation of the transaction, Glantz and Anderson assumed certain operational responsibilities. Glantz apparently undertook to make certain that American Blue Gem complied with certain legal requirements with respect to the licensing of the mine.[5] In addition, he participated in locating a Wilcox mining machine to be used on the property. In early 1977, Glantz was informed that American Blue Gem had subcontracted the mining to a company called R & M Mining Co., which was operated by Bill Ridings and a gentleman named "Monk."

On March 31, 1977, the partnership entered into an agreement with American Coal & Coke to sublease a tract of land known as the Logan property. The partnership agreed to pay a tonnage royalty of $1.35 per ton of merchantable coal mined from the property, wheelage of $0.15 per ton of coal transported across the property from other properties, and a minimum royalty of $300 per month that could be recouped against the tonnage royalty or the wheelage. The Logan tract interfaced the Detherage tract and the latter tract had to be entered through the former tract.

The results of the partnership's mining operations were unimpressive, at best. At no time was any coal mined from the Jones property. In fact, the mining equipment was never carried to that tract of property.

Mining activities began on the Detherage or Logan tract in the last week of April 1977 and continued through May 1977 or perhaps into June 1977. Some coal actually was mined from the Detherage tract, and by letter dated May 24, 1977, the following distributions from the sale of that coal were made to petitioners as limited partners:

---

[5]It should be noted, however, that no licenses were made part of the record.

| Petitioner | Amount |
|------------|--------|
| John W. Seaman, Jr. | $120 |
| Bruce A. Samson | 360 |
| Harold G. Nix | 120 |
| Richard F. Lockey | 80 |
| William J. Schifino | 80 |
| Edward Hoornstra | 60 |
| Charles A. Kottmeier | 60 |

These distributions were premature and no further distributions were ever made. In fact, at the time the distributions were made, mining operations already had been plagued with a number of problems. To begin with, initial progress was impeded by a harsh winter. In addition, difficult mining conditions were encountered at the mine opening, further slowing progress. Other problems also were encountered at the Detherage mine. The coal was dirty and had substantial impurities and a high sulphur content. The coal that was removed did not come out in lumps but rather as fines, a condition that results in a substantially reduced selling price. The crowning blow apparently occurred about a month after the commencement of mining activities, in late May or early June when difficulties with roof conditions in the mine were encountered. It was determined that the Wilcox mining equipment could not operate within the mine. At this point, efforts to continue mining the Detherage property were abandoned.

On July 18, 1977, the partnership and American Coal & Coke entered into another sublease agreement covering property known as the Waligorski property. Thereafter, some of the mining equipment that had been located on the Detherage tract was moved to the Waligorski tract, and some coal actually was mined from the property. Eventually, however, the partnership was evicted from the Waligorski tract as the result of a dispute between American Blue Gem and Bill Waligorski, the owner of the property. The eviction apparently occurred in the late summer or early fall of 1977.

Although there is evidence of attempts to locate additional properties for mining, the record fails to reveal that the partnership ever engaged in any further actual mining activities after the eviction from the Waligorski property. The evidence indicates that total tonnage mined and sold by the

partnership throughout its existence was 6,086.415 tons, all of which was mined and sold in 1977.

By at least sometime in August 1977, there had developed a dispute between Winer and the other general partners. The partnership was in serious financial straits and Winer refused to advance additional funds to the partnership. By letter dated September 27, 1977, Winer reminded Glantz and Anderson that it had been his responsibility to raise the capital necessary to form the partnership and their responsibility to get the partnership operational. Winer felt that he had lived up to his side of the agreement, but that Glantz and Anderson had not done so. By October 20, 1977, there had been a "complete deterioration of the relationships" between Winer, on the one hand, and Glantz and Anderson, on the other, as memorialized by a letter from one of the limited partners who happened to represent Winer as an attorney.

To make matters worse, a number of the limited partners were becoming disillusioned with the general partners. By letter dated February 14, 1978, one of the limited partners, Frank N. Fleischer, on behalf of himself and four other limited partners, wrote to Glantz informing him that they had learned of an Internal Revenue Service audit of the partnership and requesting information respecting the same, as well as information respecting the current status of the partnership. According to Fleischer's letter, the limited partners had received only two reports on the activities of the partnership. It was the belief of the limited partners that Glantz was not meeting his fiduciary responsibility to the limited partners.

Glantz responded to Fleischer's letter through a series of communications to the limited partners. By letter dated February 24, 1978, Glantz informed the limited partners of the audit and requested their presence at a meeting to be held a month later for the purpose of reviewing the partnership's situation. Glantz sent another letter to the limited partners dated March 29, 1978, informing them of matters discussed at the meeting, including such matters as the relocation of the partnership mine to a new unspecified leased property, the subleasing of the partnership's Jones property to a strip miner, the need for all of the limited partners to sign an amendment to the limited partnership agreement ratifying Winer's resignation, and the status of the tax audit. The next

written correspondence from Glantz to the limited partners was dated June 30, 1978. This letter conveyed the unfortunate news that the partnership had been unable to lease the new property referred to in the letter of March 29, 1978, and that the partnership had not been able, in fact, to sublease the Jones property. In addition, the letter advised the limited partners that the partnership was continuing to prospect for suitable property and also advised the limited partners of the status of the tax audit.

The displeasure of the limited partners apparently continued to increase as time went on. By letter dated September 4, 1979, Fleischer again corresponded with Glantz, stating that a number of the limited partners were very much concerned about their investments in the partnership and further stating that they had received no information with respect to their investments for well over 2 years. By letter dated April 16, 1980, five of the limited partners reminded the general partners of their agreement to lend the partnership $15,000 in connection with the defense of the partnership's tax return and threatened to institute a fraud suit against the general partners.

By further letter dated July 24, 1981, Fleischer, on behalf of himself and four other limited partners, reminded Glantz and Musicant that it had been "some time" since the limited partners had heard from the general partners and requested information regarding any attempts, or lack thereof, to get the partnership operational. In a response letter dated August 12, 1981, Glantz advised Fleischer that the partnership had been dormant for 3 years and that the partnership had no working capital with which to evaluate and acquire additional leases.

Beginning in 1977, Glantz and Anderson became interested, as officers and/or shareholders, in the corporate entities dealing with the partnership. By February 28, 1977, Anderson was serving as vice president of American Blue Gem, and by May 1977, Glantz also was serving as vice president of American Blue Gem. According to Glantz, Anderson became an officer in American Blue Gem as a part of an overall agreement that Anderson would assist the corporation in procuring financing on the mining equipment. Further, according to Glantz, he, himself, became an officer in the corporation because he was disappointed with its operations.

Eventually, in early 1978, Glantz and Anderson purchased all the outstanding shares of American Blue Gem from Hooper, Keene, Rhodes, and Ozier. Although there is no indication that the limited partners were informed of Glantz's and Anderson's status as officers of American Blue Gem in 1977, they were informed in the latter part of March 1978 that Glantz and Anderson had purchased a controlling interest in the corporation.

In April or May 1977, Glantz became an officer of American Coal & Coke. In May 1977, a corporation known as New American Coal & Coke was formed by Hooper and Keene. At the time of its formation, or shortly thereafter, New American Coal & Coke was owned 50 percent by Glantz and Anderson. Hooper and Keene owned the other 50 percent.[6] Glantz, and apparently Anderson as well, also served as officers of New American Coal & Coke after its formation. The address of New American Coal & Coke was the same as that of American Coal & Coke (hereinafter sometimes referred to as Old American Coal & Coke), the lessor of the partnership's property. In June 1977, Old American Coal & Coke changed its name to A. C. & C., Inc., and in July 1977, New American Coal & Coke changed its name to American Coal & Coke, Inc. The relationship of Old American Coal & Coke to New American Coal & Coke is entirely unclear from the record. After New American Coal & Coke was formed, Old American Coal & Coke apparently ceased operating as a going concern. According to Glantz's recollection, New American Coal & Coke took over the physical office assets of Old American Coal & Coke, but did not assume Old American Coal & Coke's financial obligations and did not deal with Knox County Partners, Ltd. In January 1978, Glantz and Anderson purchased the other 50-percent stock ownership in New American Coal & Coke. The record fails to reveal that the limited partners were informed of Glantz's and Anderson's involvement with either Old American Coal & Coke or New American Coal & Coke.

The charter of American Blue Gem was revoked on March 12, 1979, for nonpayment of franchise tax. The charter of New American Coal & Coke was revoked on August 15, 1979, for nonpayment of franchise tax. The charter of Old American

---

[6]The other 50 percent of the stock actually may have been held by Hooper's and Keene's wives or family trusts set up by them.

Coal & Coke was revoked on April 14, 1981, for nonpayment of franchise tax.

The Knox County Partners, Ltd., opened a bank account at the National Bank in St. Petersburg, Florida. That account was closed in October 1979. The partnership maintained another account at the Third National Bank in Nashville, Tennessee. The partnership used the address of American Coal & Coke for its bank account with the Third National Bank. Some of the checks written on this account were signed by James D. Perry, accountant for American Coal & Coke, and Hooper's wife. The partnership maintained yet another account with American Fidelity Bank & Trust Co., in Barbourville, Kentucky. The partnership used American Coal & Coke's address for this account, as well.

During 1977, the books and records of Knox County Partners, Ltd., were kept by Perry, who did not receive a fee from the partnership with respect to his bookkeeping services. Perry was given authority to sign checks using a signature machine with Glantz's signature as an imprint.

Knox County Partners, Ltd., used the accrual method of accounting. The partnership returns of the Knox County Partners, Ltd., reveal the following:

| Year | Gross receipts | Cost of goods sold | Interest deduction | Other income | Other deductions | Ordinary income (loss) |
|------|------|------|------|------|------|------|
| 1976 | - - - | - - - | - - - | - - - | $1,825,000 | ($1,825,000) |
| 1977 | $95,545 | $200,305 | $49,207 | $99,977 | 37,129 | (91,119) |
| 1978 | - - - | - - - | 86,675 | 199,992 | 5,091 | 108,226 |
| 1979 | - - - | - - - | 70,910 | 199,992 | 2,368 | 126,714 |
| 1980 | - - - | - - - | 66,138 | 199,992 | 1,739 | 132,115 |
| 1981 | - - - | - - - | 56,768 | 199,992 | 30 | 143,194 |
| 1982 | - - - | - - - | 52,064 | 199,992 | - - - | 147,928 |

The interest deductions were attributable to the $1,240,000 nonrecourse note delivered by the partnership to American Coal & Coke on December 31, 1976. There is no evidence that any interest actually ever was paid on the note.

The "other income" reported by the partnership constitutes so-called "mining penalty income," the "liquidated damages" arising out of American Blue Gem's failure to satisfy its minimum mining guarantee. Two notes, each entitled "Negotiable Promissory Note" (hereinafter referred to as mining penalty notes), were executed sometime in April 1979. One

was dated December 31, 1977, and the other was dated December 31, 1978. These notes were intended to evidence transactions that were to have occurred at the end of 1977 and 1978. Pursuant to the notes, American Blue Gem promised to pay Knox County Partners, Ltd., $99,976.90 with interest at the rate of 6 percent per annum, in the case of the note dated December 31, 1977, and $199,920 with interest at the rate of 6 percent per annum, in the case of the note dated December 31, 1978. The notes were signed by Glantz as the authorized officer of American Blue Gem. Glantz did not personally guarantee the notes from American Blue Gem to Knox County Partners, Ltd. The mining penalty notes were then endorsed by Musicant on behalf of Reserve Associates, Inc., as a general partner of Knox County Partners, Ltd., and assigned to American Coal & Coke in satisfaction of the principal and interest payable on the partnership's $1,240,000 note. Glantz, in turn and on behalf of American Coal & Coke, accepted the assignment in satisfaction of the partnership obligation under the $1,240,000 note. The mining penalty notes never actually were paid. In fact, it never was contemplated that they actually would be paid. No further promissory notes were executed to evidence American Blue Gem's minimum mining commitment. For 1979 and thereafter, amortization of the partnership's note via the liquidated damages allegedly was accomplished by means of some sort of journal entries. Nothing in the record suggests that actual cash payments of principal or interest on the partnership's nonrecourse note ever were made. Although the partnership's returns for 1977 through 1982 and the Schedules K-1 issued to the partners in conjunction therewith reported mining penalty income, there is nothing in the record to establish whether the partners actually reported their distributive shares of the mining penalty income through 1982.

On their 1976 and 1977 income tax returns, petitioners John W. Seaman, Jr., and Bettye H. Seaman claimed $86,688 and $1,993, respectively, as their distributive shares of the partnership's losses for those years.

On their 1976 and 1977 income tax returns, petitioners Bruce A. Samson and Adajean L. Samson claimed $260,062 and $5,982, respectively, as their distributive shares of the partnership's losses for those years.

On their 1976 and 1977 income tax returns, petitioner Harold G. Nix claimed $86,687 and $1,994, respectively, as his distributive shares of the partnership's losses for those years.

On their 1976 income tax return, petitioners Richard F. Lockey and Anne S. Lockey claimed $57,792 as their distributive share of the partnership's loss for that year.

On their 1976 income tax return, petitioners William J. Schifino and Lois A. Schifino claimed $57,792 as their distributive share of the partnership's loss for that year.

On their 1976 income tax return, petitioners Edward Hoornstra and Mildred Hoornstra claimed $43,334 as their distributive share of the partnership's loss for that year.

On their 1976 income tax return, petitioners Charles A. Kottmeier and Eloise L. Kottmeier claimed $43,343 as their distributive share of the partnership's loss for that year.

Respondent disallowed all of the foregoing losses on a variety of grounds.

## OPINION

### *Royalty Deductions*

On its 1976 partnership return, Knox County Partners, Ltd., deducted $1,825,000 as an "advance minimum royalty" and claimed an overall ordinary loss in the same amount. Respondent advances several alternative grounds to support his disallowance of petitioners' distributive shares of the partnership's loss for 1976. Respondent's primary argument, and the one most vigorously advanced, is that the partnership was not engaged in the trade or business within the meaning of section 162, I.R.C. 1954, of mining or selling coal because the mining activity of the partnership was not an activity engaged in for profit and that therefore petitioners are not entitled to any loss deductions in 1976 arising out of their status as limited partners.

Before turning to respondent's profit motive argument, alternative arguments raised with respect to the applicability of section 1.612–3(b), Income Tax Regs., as it existed either prior to amendment or thereafter, warrant a brief discussion.

Prior to its amendment in 1977, section 1.612–3(b), Income Tax Regs., read, in part, as follows:

(b) *Advanced Royalties*. (1) If the owner of an operating interest in a mineral deposit * * * is required to pay royalties on a specified number of units of such mineral * * * *annually* whether or not extracted * * * within the year, and may apply any amounts paid on account of units not extracted * * * within the year against the royalty on the mineral * * * thereafter extracted * * *

  \*   \*   \*   \*   \*   \*   \*

(3) The payor, at its option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows:

(i) As *deductions* from gross income *for the year the advanced royalties are paid or accrued* * * *

[Emphasis added.]

In Rev. Rul. 70–20, 1970–1 C.B. 144, and particularly in Rev. Rul. 74–214, 1974–1 C.B. 148, the Service indicated that lump-sum advanced royalties were currently deductible.

By News Release IR-1687, October 29, 1976, the Service announced a proposed amendment of section 1.612–3(b)(3), Income Tax Regs., and suspended Rev. Rul. 70–20 and Rev. Rul. 74–214. With respect to the effective date of the proposed amendment, IR-1687 provided as follows:

Under the proposed amendment, the treatment of advanced royalties would be revised, effective October 29, 1976, unless the advanced royalties are required to be paid pursuant to a mineral lease which (i) was binding prior to that date upon the party who in fact pays or accrues such royalties, or (ii) was required pursuant to a written contract, to be executed by the party who in fact pays or accrues such royalties, provided that such party establishes, to the satisfaction of the Secretary or his delegate, that under all of the facts and circumstances the contract was binding upon such party prior to that date. For purposes of clause (ii) above, a contract will in no event be considered to be binding upon such party if the obligations imposed on such party prior to October 29, 1976 were not substantial or were illusory.

In December 1977, the Service issued the final version of the amended regulation, retroactive to October 29, 1976. T.D. 7523, 1978–1 C.B. 192. Respondent at that time issued Rev. Rul. 77–489, 1977–2 C.B. 177, announcing the revocation of Rev. Rul. 70–20 and Rev. Rul. 74–214.

Under section 1.612–3(b)(3), Income Tax Regs., as amended, advanced royalties generally may be deducted only in the year that the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. However, the regulation recognizes an exception in the case of advanced royalties paid

or accrued "as a result of a minimum royalty provision." Under the exception, advanced minimum royalties may, at the option of the payor, be deducted in the year that they are paid or accrued. According to the regulation, a minimum royalty provision is a provision that *"requires that a substantially uniform amount of royalties be paid at least annually* either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount." (Emphasis added.)

The parties herein disagree with respect to whether petitioners are subject to section 1.612–3(b)(3), Income Tax Regs., before amended or as amended.

Respondent argues that the partnership was not subject to a binding obligation to pay advanced royalties on or before October 29, 1976, because the obligation to pay royalties was illusory and not substantial on that date and that therefore the partnership is subject to the regulation as amended. See *Gauntt v. Commissioner*, 82 T.C. 96, 104 (1984) (holding that a limited partnership's obligations under a coal sublease were "illusory" within the meaning of IR-1687, so that the transaction was subject to the amended regulation). Respondent further argues that, even assuming that the partnership was obligated on or before October 29, 1976, the limited partners were not bound by that date and that therefore the partnership is still subject to the regulation as amended. In this connection, respondent urges us to reconsider *Elkins v. Commissioner*, 81 T.C. 669 (1983), in which we held that the "party" required to be bound by a mineral lease or a written contract prior to October 29, 1976, in order for the old regulation to continue to apply, was the partnership and not the individual limited partner. It is respondent's position that, if the partnership is subject to the amended regulation, it is not entitled to a deduction in 1976 since no coal was mined and sold in that year.

Petitioners' counter to respondent's foregoing arguments is that the partnership is clearly subject to the regulation before amendment, because the partnership was bound prior to October 29, 1976, and it is irrelevant under *Elkins v. Commissioner, supra*, that the limited partners were not similarly so bound on that date. It is petitioners' position that under the regulation before amendment, as interpreted by Rev. Rul.

70–20 and Rev. Rul. 74–214, the partnership is entitled to deduct the entire advanced royalty, both the cash portion and the portion represented by the nonrecourse note. Petitioners add as an aside that, even if the partnership were subject to the regulation as amended, the royalties in question meet the definition of advanced minimum royalties and thus still would be currently deductible.

We do not intend to base our decision on any of the foregoing contentions and, therefore, we need not consider them fully. However, we do note that on two separate occasions we have considered royalty arrangements structured in substantially the same manner as was employed in the instant case. See *Maddrix v. Commissioner*, 83 T.C. 613 (1984); *Estate of Blay v. Commissioner*, T.C. Memo. 1984–565. There was no dispute but that section 1.612–3(b)(3), Income Tax Regs., *as amended*, applied in those cases. In both, we held that the royalties were not paid as the result of a minimum royalty provision and that no deduction was allowable during the years in issue since no coal was sold during those years. We think it also important to note that it is exceedingly doubtful that the old regulation permitted the deduction of lump-sum advanced royalty payments. See *Redhouse v. Commissioner*, 728 F.2d 1249, 1251 (9th Cir. 1984); *Wendland v. Commissioner*, 79 T.C. 355, 385 (1982), affd. 739 F.2d 580 (11th Cir. 1984), affd. sub nom. *Redhouse v. Commissioner, supra.*[7] Such a deduction would be not only inconsistent with the language of the old regulation, specifying that the advance royalties were required to be paid "annually," but also contrary to the well-entrenched principle of tax accounting that a payment that creates an asset having a useful life that extends substantially beyond the close of the taxable year must be deducted over the years to which the payment relates. See, e.g., sec. 1.461–1(a)(2), Income Tax Regs.; *Commissioner v. Boylston Market Association*, 131 F.2d 966 (1st Cir. 1942); *Baton Coal Co. v. Commissioner*, 51 F.2d 469 (3d Cir. 1931), cert. denied 284 U.S. 674 (1931); *University Properties, Inc. v. Commissioner*, 45 T.C. 416 (1966), affd. 378 F.2d 83 (9th Cir. 1967). Accordingly, respondent properly revoked the two revenue rulings that extended coverage of the old regula-

---

[7]See also *Tallal v. Commissioner*, T.C. Memo. 1984–486.

tion to the payment of lump-sum advanced royalties. *Wendland v. Commissioner*, 79 T.C. at 385.

With this background in mind, we turn to address respondent's profit motive argument.

Royalties traditionally have been described as akin to rent and are deductible by the payor as a trade or business expense under section 162(a)(3). *Commissioner v. Jamison Coal & Coke Co.*, 67 F.2d 342, 344 (3d. Cir. 1933); *Burnet v. Hutchinson Coal Co.*, 64 F.2d 275, 278 (4th Cir. 1933); *Ramsay v. Commissioner*, 83 T.C. 793, 810 (1984); *Surloff v. Commissioner*, 81 T.C. 210, 232 (1983). In this case, the deduction, if allowable, would be allowable to the partnership rather than directly to the partners. In order to find that the partnership's coal venture constituted the carrying on of a trade or business, we must first find that the partnership engaged in the activity with the primary and predominant purpose and objective of making a profit. *Brannen v. Commissioner*, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); *Ramsay v. Commissioner, supra* at 810; *Surloff v. Commissioner, supra* at 232–233. As used in this context, "primary" means "of first importance" or "principally," and "profit" means economic profit, independent of tax savings. *Surloff v. Commissioner, supra* at 233. While a reasonable expectation is not required, the profit objective must be bona fide. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. *Krasta v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner*, 734 F.2d 5 (3d Cir. 1984).

The determination of whether the requisite objective exists is one of fact to be resolved on the basis of all of the surrounding facts and circumstances. *Ramsay v. Commissioner, supra* at 810; *Flowers v. Commissioner*, 80 T.C. 914, 931–932 (1983). The burden of proving the existence of the requisite objective rests with petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure; *Golanty v. Commissioner*, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Greater weight should be given to the objective facts than to mere statements of intent. Sec. 1.183–2(a), Income Tax Regs.; *Surloff v. Commissioner, supra* at 233;

*Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

In determining whether the requisite profit objective was present in the instant case, our profit objective analysis must be made at the partnership level. *Brannen v. Commissioner*, 78 T.C. at 505; *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982). Therefore, we must examine the motives and objectives of the promoters and the general managers of the partnership. *Surloff v. Commissioner, supra* at 233.

Having examined all of the evidence, we conclude that petitioners have not carried their burden of proving that Knox County Partners, Ltd., was organized and operated with the *primary and predominant* objective of realizing an economic profit. Petitioners' case was built largely around the self-serving testimony of their two witnesses, Musicant and Glantz. Although we found those witnesses to be generally forthright and credible, and do believe that they made some commitments to getting the partnership operational, when we look behind their self-serving testimony to the objective facts, we are left with the undeniable impression that the *primary* objective behind the formation of Knox County Partners, Ltd., was to secure attractive tax writeoffs for the limited partners.

It is undisputed that Musicant had no prior experience in coal mining. He did, however, have experience in structuring tax shelters. Furthermore, petitioners' contention that Glantz and Anderson possessed considerable experience in coal mining prior to their involvement in Knox County Partners, Ltd., is not supported by the evidence. By Glantz's own admission, he first became acquainted with the coal mining industry in 1975 or 1976, when some people he knew approached him with respect to joining them in a strip mining venture. At most, the evidence suggests that the involvement of Glantz and Anderson in the coal mining business was primarily that of investors in various unsuccessful coal ventures. In addition, the offering memorandum for the Knox County Partners, Ltd., itself cautions potential investors that the general partners had little experience in operating a coal mining business.

That the primary objective behind the formation of Knox County Partners, Ltd., was to market tax shelters is evident from the very earliest planning stages. In their haste to execute all of the necessary documents in time to locate

investors interested in claiming substantial deductions for their 1976 tax years, the general partners unreasonably neglected to investigate the leased properties in a timely and responsible fashion. There is no evidence that any of the partners actually saw the Detherage tract prior to the execution of the lease on October 15, 1976. Furthermore, it was not until after the execution of the lease that Glantz engaged Cummings to prepare a report on the property. Although none of the general partners contemplated being involved in the day-to-day operations of the mine, the general partners took the risk, at the time they executed the lease that collateral agreements with respect to the mining and selling of coal would be forthcoming. The general partners merely accepted on faith the viability of American Coal & Coke and the representations made by it concerning the value and economic potential of the property. In their haste, the general partners were satisfied with putting the cart before the horse. In doing so, they failed to discover a title defect in about one-half of the leased property. Such a cursory investigation of the leased premises cannot be squared with a primary economic profit objective.

In marked contrast with the general partners' initial failure to investigate properly the background of American Coal & Coke, an entity that was destined to play an essential role in the overall transaction, and the conditions of the leased property, were the partners' diligent efforts to pin down the tax consequences to potential investors. It was determined from the very outset that, in order to maximize tax benefits, the lease would be structured using an advanced royalty. After the lease was executed, the general partners wasted no time in engaging the services of an attorney to write a tax opinion to be included in the offering memorandum. Petitioners contend that the partnership is permitted to take advantage of tax deductions provided by law without destroying the validity of its profit objective. Of course, in so contending, petitioners miss the mark. The point is that the actions of the general partners, in elevating the importance of securing tax advantages over the importance of investigating the economic viability of the venture, belie a primary economic profit objective.

It is true that, after the preliminary stages, the partners did make inquiries into the background of American Coal & Coke. However, when one considers the very substantial role that the corporation and its related corporation, American Blue Gem, were to play in the partnership's operations, it becomes apparent that the inquiries were superficial. Glantz allegedly checked a number of references; however, all of the references checked were supplied by American Coal & Coke, and Glantz admitted that he subsequently discovered that some of those references worked for American Coal & Coke or were affiliated in some manner. At no time did the general partners verify the résumés of the corporate officers or request to examine American Coal & Coke's books and records. Nor did they attempt to discover whether there were any judgments against American Coal & Coke, or whether, and if so, to what extent, the corporation's assets were encumbered. The superficiality of the investigations is revealed clearly by the general partners' subsequent discovery that American Blue Gem was not even in existence when discussions with American Coal & Coke commenced.

It is also true that the general partners engaged Cummings to prepare an engineering report and coal reserve estimate on the Detherage tract. However, they did not do so until *after* the lease was executed. Moreover, several facts call into question the general partners' good-faith reliance on Cummings' report. In the first place, the services of Cummings, who was a surveyor and not a mining engineer, were engaged at the recommendation of Cliff Hooper, one of the officers of American Coal & Coke. In the second place, Cummings' report was merely a description of the Detherage tract and an estimate of coal reserves on the property. It did not address the economic feasibility of mining coal from the Blue Gem seam. The report, however, did contain the caveat that "Inasmuch as the coal reserves are estimated, it is recommended that core drilling as per standard procedure be utilized to verify and prove the reserves." We find the failure to heed this recommendation significant.

In addition to the foregoing, the substantive correctness of Cummings' report was called into question by respondent's experts, Marilyn D. Maisano and E. D. Conaway. For example, Conaway concluded that the data in the offering memorandum

with respect to recoverable coal reserves was too optimistic and did not represent a sound basis for a profitable mining operation. According to Conaway, the in place and recoverable estimates of coal seam reserves were not documented by actual measurements, the average coal thickness used in reserve calculations was greater than could be measured, and the recovery factor of 70 percent used by Cummings was too high. Conaway's computations of probable and recoverable reserves fell far short of Cummings' computations.

It is unnecessary for us to attempt to resolve the differences between Cummings' report and Conaway's report, because such an endeavor would serve only to distract us from the crucial question of whether, regardless of the amount of recoverable reserves, Knox County Partners, Ltd., had a good-faith objective of mining and selling coal for economic profit. As we have suggested in other cases, the existence of minable seams of coal is meaningless without a thorough study of the methods that would be required to mine the coal, the equipment that would be used, the costs of such mining, and the prospects for selling any coal mined. *Surloff v. Commissioner*, 81 T.C. 210, 235 (1983).[8]

There is no evidence that the general partners prepared any meaningful study of the economic feasibility of mining coal from the various tracts of property leased from American Coal & Coke and delivering the coal to the marketplace. In preparing the financial projections included in the offering memorandum, Musicant relied substantially upon information conveyed to him by American Coal & Coke, hardly a disinterested party.

Petitioners contend that the general partners, in structuring the lease transaction, did investigate the costs of operations and took responsible steps to assure that these costs could be met. In this connection, petitioners further contend that the amount of the advanced royalty was determined by the needs of the mining operation and the commitment of American Coal & Coke to advance to American Blue Gem enough of the advanced royalty to provide for equipment and working capital adequate to open a mine. The evidence, however, in several respects, belies petitioners' contention. First, the

[8] *Tallal v. Commissioner*, T.C. Memo. 1984-486.

general partners, in relying upon American Blue Gem's exclusive discretion to perform all of the mining operations, entrusted the future economic viability of the partnership to a corporation that was not even in existence until December 1, 1976. The record does not disclose clearly what sort of staff was employed by American Blue Gem. In fact, there is little evidence that American Blue Gem was anything other than a paper corporation, owned and controlled by the principals of American Coal & Coke. On December 31, 1976, American Coal & Coke loaned American Blue Gem $206,000 for purposes of establishing the initial mining operation. This sum was about one-half of the cost estimated by American Coal & Coke, prior to the execution of the lease, as being necessary to open the mine. The alleged reason for the decrease in assumed costs was that American Coal & Coke had recommended that less expensive mining equipment be used, which equipment, of course, subsequently proved incompatible with the conditions existing in the Detherage mine.

Furthermore, petitioners' contention that the general partners took steps to assure that the cash portion of the advanced royalty would be sufficient to provide working capital adequate to open the mine runs athwart the testimony of Glantz that he and Anderson were placed in the position of having to loan substantial sums of money to American Blue Gem to pay for equipment. Certainly, the partnership itself did not possess the wherewithal to pay the costs of mining operations, since it was seriously undercapitalized. After paying the advanced royalty, the partnership apparently retained only $15,000 as working capital.

Another indication that the primary objective behind the formation of the partnership was to secure attractive tax writeoffs for the limited partners is the disproportionately large royalty required to be paid by the partnership to American Coal & Coke. By lease dated September 28, 1976, American Coal & Coke was obligated to pay a tonnage royalty of $0.70 for each net ton of coal mined from the Detherage tract and a minimum royalty of $250 per month, or $3,000 per year. American Coal & Coke almost immediately turned around and subleased the property to the partnership, which agreed to pay a tonnage royalty of $2.10 for each net ton of coal mined and a minimum royalty of $200,000 per year. Such

a phenomenal increase in rates fairly may be described as magical and, under the facts of this case, only can be explained as a means of inflating the deductions for the limited partners. Cf. *Surloff v. Commissioner*, 81 T.C. at 235–236.[9]

We flatly reject petitioners' argument that the overvaluation was justified because the transaction negotiated with American Coal & Coke was in the nature of a turnkey contract. According to petitioners, the ancillary services and obligations to be performed by American Coal & Coke and American Blue Gem, such as developing the mine, acquiring the necessary mining equipment, and arranging for the sale of coal, were what made the property valuable. The fallacy of petitioners' argument is obvious if for no other reason than the fact that, at the time the lease was executed on October 15, 1976, obligating the partnership to pay a tonnage royalty of $2.10 and an advanced royalty of $1,825,000, no other collateral agreements had been reached with American Coal & Coke and, of course, none had been reached with American Blue Gem, since that entity did not exist at that time. Absolutely no credible evidence exists upon which we could conclude that any portion of the royalties was allocable to a turnkey contract. In fact, when questioned about what portion of the cash and note delivered to American Coal & Coke on December 31, 1976, was allocable to royalties and what portion was allocable to the alleged turnkey contract, Musicant admitted that the entire amount was allocable to royalties. Moreover, we note that, although various collateral agreements eventually were executed between the partnership, on the one hand, and American Coal & Coke or American Blue Gem, on the other, those agreements were not executed until December 2, 1976, at which time they were placed in escrow, to be destroyed in the event that the advanced royalty was not paid on or before December 31, 1976. These agreements made independent provision for compensation to be paid to American Coal & Coke or American Blue Gem for services rendered. In short, we are left with the inescapable conclusion that the royalties were grossly overstated in relation to the value of the leased property.

---

[9]Cf. also *Tallal v. Commissioner, supra*.

In our view, the unbusinesslike and hurried manner in which the partnership's coal venture was put together clearly foreshadowed the many disasters that shortly thereafter befell the partnership. Although the partnership did engage in some mining activities, they were forced to admit defeat within less than a year after they had located the limited partners. As far as we can determine from the record, actual mining activities occurred during, at most, a total of 5 or 6 months. Moreover, total tonnage of coal mined and sold by the partnership was only 6,086.415 tons, far from an outstanding achievement when compared to the 912,500 total tonnage required to be mined and sold in order to recoup the $1,825,000 advanced royalty.

Petitioners' contention that the ultimate demise of the partnership's business was caused by *one* circumstance, the fact that the price of coal never increased, but rather stayed steady and then declined, is without merit under the facts. Moreover, this risk was specifically noted in the offering memorandum, which cautioned investors that the market price of coal had been declining since 1975.

We are not persuaded by petitioners' contentions that the general partners kept the limited partners fully advised of all developments. The majority of the written communications from the general partners were sent only after the Service had begun to audit the partnership and in response to letters from the limited partners complaining about the lack of communications and threatening to bring a fraud suit against the general partners. It is reasonable to assume that the letters were sent, not in response to any bona fide intent to keep the limited partners current on the partnership's status, but in an effort to build the record for whatever future litigation might ensue.

Respondent asserts that the corporate histories of American Coal & Coke and American Blue Gem also indicate the lack of a bona fide profit objective. We are inclined to agree with respondent that the convoluted and incestuous corporate and personal interrelationships are highly suspicious and suggest less than arm's-length dealings between the partnership, American Coal & Coke, and American Blue Gem.

The use of the large nonrecourse note, under the facts of this case, is another indication of the lack of a bona fide profit

objective, because that note was contingent, illusory, and without any real economic substance. We have indicated on numerous occasions that the existence of large nonrecourse notes in circumstances where it is unlikely that the notes will be paid is itself an indication that the primary objective of an activity is to generate tax deductions rather than to earn an economic profit. *Ramsay v. Commissioner*, 83 T.C. 793, 820 (1984); *Estate of Baron v. Commissioner*, 83 T.C. 542, 556 (1984); *Surloff v. Commissioner*, 81 T.C. at 237–238; *Flowers v. Commissioner*, 80 T.C. 914, 937 (1983).

The facts herein reveal that sometime towards the end of 1976 potential investors with incomes taxed at the rate of at least 50 percent received copies of the offering memorandum seeking subscriptions for 20 limited partnership units at $30,000 per unit. Because of the presence of the nonrecourse note, upon making a $30,000 investment, an investor claimed an immediate tax loss of $86,688. That fact, on its face, warrants some scrutiny. This is particularly true in the instant case, since it was never contemplated that the partnership would make actual cash payments on the note in the event and to the extent that the partnership failed to mine and sell coal from the property. Petitioners contend, however, that, even in the event that the partnership failed to mine and sell coal, the note nevertheless would be paid "inexorably and immutably, year after year" by the application of the "liquidated damages" owed by American Blue Gem on its failure to satisfy the minimum mining guarantee.

In our view, the arrangement for the "payment" of liquidated damages was as devoid of economic substance as was the original nonrecourse note. It was admitted at trial that it was never contemplated by the parties that the liquidated damages actually would be paid in cash. All that was necessary was for American Blue Gem to deliver its notes in "payment" of liquidated damages to the partnership, which, in turn, would endorse them over to American Coal & Coke in satisfaction of the partnership's nonrecourse note. American Coal & Coke never intended to enforce American Blue Gem's notes and, as far as the record reveals, never did so. Perhaps, in recognition of the glaring transparency of this arrangement, notes representing liquidated damages allegedly owing in 1977 and 1978 were not executed until April 1979, at which time they were

backdated. The circularity of the arrangement is apparent when one considers that Glantz signed the notes on behalf of American Blue Gem, Musicant endorsed the notes on behalf of Knox County Partners, and Glantz then again signed the notes on behalf of American Coal & Coke. In 1979, the parties, apparently recognizing the arrangement for what it was, a meaningless exchange of paper, abandoned even its form in that they did not bother to execute and endorse any additional notes. Instead, for 1979 and for each year thereafter, amortization of the partnership's nonrecourse note via the liquidated damages was allegedly accomplished by means of some sort of journal entries, which were never produced at trial. We find it somewhat difficult to understand how liquidated damages generated journal entries for 1979 and each year thereafter as alleged by petitioners, when it appears that the corporate entities involved ceased operating as going concerns in 1979 or shortly thereafter. In fact, Glantz's testimony suggested that Old American Coal & Coke ceased operating as a going concern as early as 1977, when New American Coal & Coke was formed. The fact of the matter is that no cash ever changed hands, or ever was intended to change hands, as a result of the liquidated damages arrangement. The arrangement was merely an illusory mechanism by which to reduce a debt that itself lacked any economic substance. As such, the arrangement must be ignored.

We recognize that the partnership reported on its partnership returns the liquidated damages as non-cash taxable income up until at least 1982. However, the reporting of this phantom income, alone, does not justify the conclusion that the provision for liquidated damages had economic substance in reality. Although Schedules K-1, reflecting as income the liquidated damages, were prepared up until 1982, we have no way of knowing from the record which, if any, of the partners actually took these amounts into income throughout this period. To the extent that they did so, they did so erroneously, since neither the original nonrecourse note that was allegedly amortized by the liquidated damages nor the liquidated damages, themselves, should be respected for tax purposes.[10]

---

[10]We note that there was some suggestion at trial that all of the years in which petitioners allege they have reported "mining penalty income" are open tax years, and apparently protective refund claims may have been filed in some cases.

In sum, based on a review of the objective facts established in the record, we hold that petitioners have failed to carry their burden of proving that the Knox County Partners, Ltd., was organized and operated with the primary and predominant objective of realizing an economic profit. Accordingly, respondent's disallowance of petitioners' distributive shares of the partnership's loss for 1976 is sustained.[11]

## Interest Deductions

On its 1977 partnership return, Knox County Partners, Ltd., deducted $49,207 as interest accrued on the $1,240,000 nonrecourse note. In his notices of deficiency to petitioners in docket Nos. 1235-81, 1236-81, and 1237-81, respondent disallowed the partnership's deduction for accrued interest on the grounds that the nonrecourse note lacked economic substance and did not represent true indebtedness. We agree with respondent's determination.

Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." For the deduction to be allowable, however, the indebtedness must be genuine. *Knetch v. United States*, 364 U.S. 361 (1960); *Elliott v. Commissioner*, 84 T.C. 227 (1985); *Surloff v. Commissioner*, 81 T.C. at 242; *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Whether the nonrecourse note created a bona fide debt is a question of fact, the burden of proof of which is on petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure.

We have already concluded that the nonrecourse note lacked economic substance. It is readily apparent that the advance royalties called for in the note greatly exceeded the fair market value of the leasehold interest in the Detherage property. At about the same time that the partnership agreed to pay American Coal & Coke a $200,000-per-year minimum royalty, American Coal & Coke agreed to pay the owner of the property a $3,000-per-year minimum royalty. Musicant, himself, admitted that the amount of the note probably exceeded the value of the land and that the amount of the royalties was not determined on the basis of the fair market value of the

---

[11]Since the partnership generated no income in 1976, sec. 183(b)(2) is not applicable.

leasehold interest. According to Musicant, the amount of the note took into account the services that American Coal & Coke was to render to the partnership. However, we have already rejected petitioners' argument that the overvaluation was due to the alleged turnkey nature of the arrangement. Thus, we are left with but one conclusion—the nonrecourse indebtedness unreasonably exceeded the fair market value of the leasehold interest. In addition, while we believe it well may be that the partnership would have paid the note when, as, and if coal was mined, it is conceded that the parties never intended an actual cash payment of principal or interest if coal was not mined. Thus, in our view, the note was contingent in nature. We reject petitioners' contention that the liquidated damages arrangement cured the contingency. *Maddrix v. Commissioner*, 83 T.C. 613, 623–625 (1984); *Estate of Blay v. Commissioner*, T.C. Memo. 1984–565. As we previously noted, the liquidated damages arrangement itself was devoid of economic substance.

Since the nonrecourse note did not constitute true indebtedness by reason of its lack of economic substance, the requirement of section 163(a) that interest be paid or accrued on indebtedness is not met. Therefore, the partnership is not entitled to a deduction for accrued interest in 1977.[12]

## *Deductions for "Costs of Goods—Development Costs"*

On its 1977 partnership return, the Knox County Partners, Ltd., deducted $200,305 for "cost of goods sold and/or operations" and $37,129 for "other deductions." The latter category of deductions, according to the partnership return, was comprised of mine development expenses ($23,800), professional fees ($5,883), travel and promotion ($5,332), license fees ($1,000), utilities ($1,000), and miscellaneous ($114). Respondent's notices of deficiency to petitioners in docket Nos. 1235–81, 1236–81, and 1237–81 state as follows: "A deduction for costs of goods—development costs in the amount of $110,457.64 claimed on the partnership return for 1977 is disallowed because the partnership has failed to establish that

---

[12]Petitioners argue that *Commissioner v. Tufts*, 461 U.S. 300 (1983), requires that the nonrecourse note be recognized and treated as the functional equivalent of recourse debt. However, this argument has been rejected on a number of occasions. See *Odend'hal v. Commissioner*, 748 F.2d 908, 912–913 (4th Cir. 1984), affg. 80 T.C. 588 (1983); *Elliott v. Commissioner*, 84 T.C. 227 (1985); *Fuchs v. Commissioner*, 83 T.C. 79, 102 n. 10 (1984); *Dean v. Commissioner*, 83 T.C. 56, 78 n. 10 (1984).

the claimed deduction (a) was paid, and if paid, was paid for the purpose stated, and (b) ordinary and necessary business expenses."[13] On brief, respondent contends that petitioners have not substantiated the deduction since it has not been established what expenses the deduction relates to or whether the expenses have been paid.

The record fails to so much as reveal precisely what deductions comprised the $110,457.64 disallowance. There was a passing reference at trial to alleged mining development expenditures in the amount of $37,129. Petitioners' brief does little more than cursorily discuss the matter in a paragraph as an "ancillary issue."

Since the deductions claimed by the partnership in 1977 for "cost of goods sold and/or operations" and "other deductions" total $237,434, respondent apparently allowed over one-half of the deductions claimed. However, precisely which deductions were allowed and which deductions were disallowed we cannot say based on the record before us. It was incumbent upon petitioners to enlighten the Court, since they bear the burden of proof. Under the circumstances, we must hold that they have failed to carry their burden of proof on the issue, and we must sustain respondent's disallowance of the deductions.

*Decisions will be entered under Rule 155.*

---

[13]The notice of deficiency to petitioners in docket No. 1236–81 actually disallows a deduction in the amount of $110,456.64, instead of $110,457.64.