DAVID KREBS AND CHERYL KREBS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krebs v. Commissioner
Docket No. 254-90.
United States Tax Court
T.C. Memo 1992-154; 1992 Tax Ct. Memo LEXIS 161; 63 T.C.M. (CCH) 2413; T.C.M. (RIA) 92154; March 18, 1992, Filed *161 Decision will be entered under Rule 155. Ira B. Stechel and Thomas J. Fleming, for petitioners. Drita Tonuzi, for respondent. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies of $ 15,563 for 1979 and $ 52,642 for 1981 and an addition to tax of $ 13,160 for 1981 under section 6651(a)(1). David Krebs was a successful contemporary musical and theatrical promoter in the years at issue. Respondent disallowed: (1) Deductions attributable to expenses to promote Cheryl Krebs' music career, and (2) losses attributable to certain theatrical production, talent management, recording, and publishing endeavors begun as a business venture by David Krebs but which were discontinued. After concessions the issues to be decided are: 1. Whether petitioner's promotion of Cheryl Krebs' music career was an activity engaged in for profit within the meaning of section 183(a). We hold that it was. 2. Whether petitioners are entitled to deduct $ 58,923 in 1981 and $ 80,674 in 1982 for expenses relating to Cheryl Krebs music activities. We hold that they are. 3. Whether petitioners are entitled to deduct under sections 162 or 165(c), *162 $ 151,645 for 1981 and $ 500 for 1982 for losses from several ventures. We hold that they may deduct losses with respect to Rockworld and America Live, but not with respect to Profiles in Shame, SoHo News, and the Cosmic Muffin. 4. Whether petitioners are liable for an addition to tax under section 6651(a)(1) for late filing of their 1981 return. We hold that they are. Respondent's deficiency determination for 1979 resulted from petitioners' claim for a carryback to that year. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. References to petitioner are to David Krebs. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners are husband and wife who resided in New York, New York, when they filed their petition. They filed joint Federal income tax returns as cash basis taxpayers reporting on a calendar year basis for 1979 through 1982. a. Petitioner
Petitioner received a law degree from Columbia University Law School in 1963. He also received a master of business administration degree from Columbia *163 University Business School. In 1964 petitioner began working for the William Morris Agency, one of the largest theatrical agencies in the world. From 1964 to 1968, he was an attorney in the business affairs department, and he eventually became the assistant to the department head. From 1969 to 1972, he was a theatrical agent in the contemporary music department where Steven Leber (Leber) was the department head. Petitioner and Leber left the William Morris Agency in 1972 to form Contemporary Communications Corp. (CCC). At CCC they managed and promoted musical groups and shows, including Jesus Christ Superstar and Beatlemania. Petitioner and Leber each owned 50 percent of CCC. Petitioner invested in various rock and roll and pop musical projects, many of which were speculative. He sometimes paid funds to keep a project going to give him time to evaluate it, knowing that if he later abandoned it those funds would be lost. Overall, he was quite successful, although many of the projects that he was involved with ultimately failed. Some of his projects were very profitable. b. Cheryl Krebs
Cheryl Krebs was the daughter of an actress. Cheryl Krebs enjoyed singing and performing. *164 She began vocal training when she was 8 years old. She took various music and acting lessons including some from Lee Strasberg at the Academy of Theatrical Arts. In the early 1970s she organized a five-person band called Piece of Mind that sometimes performed in public. Cheryl Krebs was under a management agreement with Peter Bennett, a record promoter for Apple records, from 1973 to 1976. She also developed a solo act called the Cheryl Ashley Experience. Cheryl Krebs appeared on television in a Bob Hope Chrysler Special. She sang in celebration of singer Bobby Vinton's birthday in Las Vegas. She joined the American Federation of Television and Radio Artists (AFTRA) in 1974, of which she is still a member. She performed in various television soap operas. Cheryl Krebs was employed as a cocktail waitress at the Playboy Club from about 1970 to 1976 where she was a hostess whose duties sometimes included singing. In 1977 Cheryl Krebs was represented by the Dorothy Palmer Talent Agency, Inc. (Dorothy Palmer), for 1 year. Her photo appears with others on the cover of the fall-winter 1977 Dorothy Palmer brochure. Cheryl Krebs is described in the brochure as an actress, model, *165 and singer. However, she only did print modeling for Dorothy Palmer. Cheryl Krebs and petitioner were married on July 22, 1979. In that year Cheryl Krebs sang with a band called Ashley and Glen. Although she or the band with whom she was performing was paid for some performances, she never made a profit at singing. 2. Contemporary Communications Corp. (CCC)
Petitioner and Leber formed CCC to promote and manage rock and pop groups. CCC also became a record production company. It organized a number of wholly owned incorporated subsidiaries, including Leber Krebs, Inc., Daksel Music Corp., and Privates Cabaret, Inc. (Privates), to conduct other similar entertainment and media-related activities. During the years in issue, Leber Krebs, Inc., managed rock and pop musical artists. Daksel Music Corp. published rock and pop music. Privates was a performing arts center in Manhattan that contained a 1,000-seat theater as well as other artists' performing spaces and a 400-seat restaurant. Rock bands rehearsed and performed there. Petitioner and Leber invested in musical groups by paying the musicians, the group's road crew, rehearsal and recording studios, and promotional *166 and production costs that they believed were necessary to make the group a viable prospect for a recording contract. Petitioner and Leber believed that an investment of $ 100,000 to $ 350,000 over a 1-1/2- to 3-year period was necessary to develop a musical act which had never recorded commercially to the point of obtaining a recording contract. This management philosophy was contrary to most others. Most other managers did not invest in their acts by paying musicians' salaries while developing the act. Petitioner and Leber, through CCC and Leber Krebs, Inc., identified and promoted the performing and recording careers of several highly successful rock and pop stars including Aerosmith, Ted Nugent, AC/DC, Def Leppard, the Scorpions, and Michael Bolton. During the years in issue, CCC and its subsidiaries had approximately 30 employees and managed about 25 different artists and groups. Petitioner conceived the idea of a book that covered all contemporary music from a historical perspective. Through an agreement with Sherma Books in 1979, petitioner published the Contemporary Music Almanac 1980/1981 (Almanac) in 1980. At times, petitioner invested in entertainment-related ventures *167 without Leber or CCC making a coinvestment and vice versa. Leber and petitioner viewed their obligation to each other in this regard as only to make an offer of first refusal. The computations were made by Bruce Palley, C.P.A. (Palley), who was CCC's director of financial affairs and comptroller. Palley's computations were made from books and records maintained by Deborah Prisco (Prisco). Palley's work was monitored by Prager & Fenton, an accounting firm specializing in the entertainment and music business. Robert Bandman, C.P.A. (Bandman), a 20-year partner at Prager & Fenton, was responsible for the preparation of CCC's and petitioners' income tax returns for the years at issue and several preceding years. Petitioner and Leber had instructed Bandman that expenses paid by CCC representing costs attributable to Citizens Band and Cheryl Krebs were not to be deducted by CCC as business expenses for tax purposes, but instead were to be charged against the loan account representing amounts due to petitioner from CCC. Palley, Prisco, and Bandman followed these instructions. After more than 26 years, CCC ceased doing business in 1989. That was the only time petitioner and Leber *168 executed a formal agreement. 3. Citizens Band
Petitioner and Cheryl Krebs formed Citizens Band in 1980 in an attempt to enable Cheryl Krebs to become a successful recording star. Cheryl Krebs was its lead vocalist. She did some composing as well. In addition to Cheryl Krebs, Citizens Band had four professional musicians, including keyboard player Chris Meredith (Meredith). Meredith also composed. The band also had a bass player, guitar player, and drummer. There was no written agreement executed when the band was formed. Leber knew of the Citizens Band project, but declined to participate because he did not want to become involved with managing his partner's wife. Petitioner and Leber clearly understood that Citizens Band was petitioner's personal project for which petitioner was to bear all economic risks and benefits. Leber had no financial, management, or other economic interest in Citizens Band or Cheryl Krebs' career. Petitioners' ultimate goal for Citizens Band was for it to become commercially successful by signing a recording contract with a major record label and to sell a large number of records. There was no attempt to achieve success by performing as *169 a live band. Band members received weekly salaries of $ 200 to $ 250 from petitioner. The band generally rehearsed 7 to 8 hours per day, 5 days per week. It occasionally performed in public. Rehearsals were conducted in rehearsal studios or at Privates. Top recording studios such as Electric Lady normally charged $ 150 to $ 200 per hour in 1982. However, petitioner negotiated for Cheryl Krebs and another act to record at Electric Lady for $ 55 per hour with an additional $ 180 per hour and 2 percentage points of the retail gross if the band became successful. A trademark search was conducted for the name Citizens Band. There is no evidence that petitioner applied for or received a trademark. Petitioner often conducted the Citizens Band project using CCC accounts and letterhead. He believed it was better for the project. He was concerned that the industry would misinterpret any absence of CCC backing for Citizens Band and Cheryl Krebs. Also, CCC had many established business relationships in the industry with rehearsal and recording studios that Citizens Band and Cheryl Krebs could use. Leber knew that petitioner was using CCC's accounts and name for this project. Prisco *170 paid Citizens Band expenses incurred in CCC's name. She issued checks on behalf of CCC at either Leber's or petitioner's request and listed them on a monthly report that she gave to petitioner. Prisco also held petitioner's personal checkbook and maintained his personal financial records and wrote checks from petitioner's checkbook at his request. At CCC's fiscal yearend, amounts paid by CCC at the request of petitioner or Leber for personal purposes were offset against amounts owed to Leber or petitioner by CCC. Leber ensured that petitioner's personal liabilities that were paid by CCC were reimbursed to CCC from petitioner's share of the CCC funds during the yearend accounting. 4. The CBS Recording Contract
Petitioner obtained a recording contract for Cheryl Krebs and Citizens Band from CBS Records (CBS) partly as a result of petitioner's longstanding relationship with CBS. He had previously entered into 10 to 15 other recording agreements with CBS and had brought successful rock and roll bands such as Aerosmith and Ted Nugent to CBS. On May 1, 1982, CCC signed a recording contract with CBS. At the same time, Cheryl Krebs and Meredith, professionally known as Citizens *171 Band, signed a recording contract with CCC. The CBS contract required CCC to furnish the services of Cheryl Ashley and Meredith, professionally known as Citizens Band, to perform for the purpose of making master recordings for CBS. Under the CBS contract, CCC was required to produce the recordings and deliver them to CBS. CBS then had an option that it could exercise in exchange for $ 75,000 plus recording royalties under a schedule provided in the contract. CBS paid $ 1,000 for the recording contract. Citizens Band provided a recording to CBS, but CBS allowed the option to lapse. The recording was not commercially exploited and did not generate any income. After the lapse of the CBS option, Citizens Band disbanded. 5. Profiles in Shame
Petitioner originated the concept of a book to be entitled Profiles in Shame that was to be an examination of the history of political corruption in the United States. Petitioner asked Leonard Sherman (Sherman) to write the book. A collaboration agreement was prepared detailing the understanding of the parties; however, it was not executed. Nonetheless, the terms stated in the draft were generally followed. Petitioner agreed to *172 fund the expenses of the project in exchange for an equal division of the profits to be realized after recoupment of his expenses. Petitioner hoped to earn a profit from book sales and home videos based on the book. Petitioner wrote checks to Sherman in 1981 totaling $ 16,916.33 in connection with the research and writing of a book entitled Profiles in Shame. The project ended when petitioner and Sherman disagreed on the scope and coverage of the book and its concepts. Petitioner had no dealings with Sherman after 1981 and has not attempted to continue with the project. However, petitioners continued to claim losses from Profiles in Shame in 1982. 6. Rockworld
Rockworld was a television show that involved the broadcast of excerpts of music videos that were licensed for promotional purposes by record labels. Petitioner believed at the time that the concept had financial possibilities. The show was broadcast on 15 to 20 television stations. The Rockworld concept was subsequently successfully exploited by MTV cable network. Petitioner paid $ 5,000 to acquire the rights to promote a television show for syndication from its owner, Ed Noyes (Noyes). Petitioner also agreed *173 to pay Noyes $ 500 per week as a consultant. Petitioner paid Noyes $ 8,000 as a consultant. Petitioner also paid $ 5,500 as attorney's fees for the Rockworld project, an additional $ 733.35 for errors and omissions insurance premiums, and $ 2,000 to WNEW-TV. Petitioner later learned that the venture was severely undercapitalized and that it would require a lot more money, so he terminated his involvement with the venture. Rockworld became defunct at that time. Petitioner had no further dealings with Noyes. 7. America Live Audio Tapes
America Live was a live multihour radio concert special sponsored by CCC at Privates on November 3, 1980, the night before the 1980 election. It was broadcast simultaneously to the leading rock stations in 10 or 15 cities, including Detroit, Washington, D.C., Boston, and Philadelphia. It was to be taped for broadcast the following day to 30 stations. America Live was intended to help the youth audience understand the importance of voting. One of the America Live performers was Felix Pappalardi (Pappalardi), who also conducted the Liberty Blues Band. Pappalardi was a producer in the early age of rock and roll. There was an equipment *174 failure on the night of the broadcast involving the telephone line feeds for broadcast to other stations. Petitioner engaged Pappalardi to review the audio tapes for the album and to correct any problems. Petitioner wrote two checks totaling $ 2,500 in 1981 to develop a record album from audio tapes of a live radio concert that he had sponsored the prior year and which had been broadcast at the time on several stations nationwide. The checks written on petitioner's personal account to Pappalardi had memos referring to America Live. The telephone equipment failure did not affect the album project. However, the quality of a live 24-track recording of artists performing one or two songs is generally touch and go. Petitioner abandoned the project when he learned that the cost of using them to create an album would be prohibitive. 8. Soho News
Soho News was an avant garde weekly newspaper owned by a British publishing company that reported cultural and artistic events and competed with the Village Voice newspaper. Petitioner met with Jim Goode (Goode) and Jerry Taylor (Taylor) to investigate the prospects or potential of buying the SoHo News. Goode had been an executive *175 news editor of Playboy and Penthouse magazines, and a correspondent with Life Magazine. Goode was also founder and publisher of Earth Magazine. Petitioner had no other dealings with Goode. Petitioner wrote the following checks from his personal checking account. None of the checks included any memo or description. Check
Date
Amount
No.
September 2, 1981
$ 1,000 713
September 14, 1981
1,000
720
September 17, 1981
1,000
722
September 25, 1981
1,000
731
October 12, 1981
1,000
744
August 17, 1981
1,000
748
October 30, 1981
1,000
753
November 10, 1981
1,000
785
November 18, 1981
1,000
[unknown]
December 1, 1981
2,000
893
October 24, 1981
1,000
897
October 26, 1981
1,000
898
Total    $13,000
Some of the dates and check numbers in the record are not clear. Taylor had been publisher of the National Lampoon and Harper's Bazaar. Taylor's business was called Taylor Shain. On April 14, 1982, petitioner wrote a personal check to Taylor Shain, Inc., for $ 3,482.29 with the memo, "legal - SoHo News". The British company which owned Soho News provided petitioner, Goode, and Taylor with income statements and balance sheets. Petitioner, Goode, and Taylor later *176 realized that the numbers that they were given were phony. Only petitioner made any monetary contribution. He had the final say, upon the advice of Goode and Taylor. Petitioner later abandoned the idea. Petitioners deducted amounts for Soho News on their 1982 income tax return. 9. Cosmic Muffin
The Cosmic Muffin was a popular radio personality in Boston who had a daily program during which he would interpret the astrological weather for the community. Cosmic Muffin's real name was Daryl Martini (Martini). Petitioner met with Martini several times to explore the possibility of acquiring the radio show to syndicate it for broadcast nationwide. On April 13, 1981, petitioner wrote a personal check to the Cosmic Muffin for $ 2,500 in connection with the syndication idea. Petitioner decided that he would not be confortable promoting that kind of entertainment about a month or two after he began this investigation and thereafter abandoned it. 10. Notice of Deficiency
Respondent disallowed expense deductions related to Cheryl Krebs' music activity of $ 58,923 for 1981 and $ 80,674 for 1982, explaining that the activities "were not activities entered into, engaged *177 in, or conducted for profit." As to the other activities, the notice of deficiency stated: It is determined that the claimed expenses listed as other expenses and depreciation are disallowed because you have not substantiated them or shown that they were incurred, or that they constitute ordinary and necessary business expenses. You have not shown that you are engaged in a trade or business. You have failed to demonstrate any current regular activity directed toward making a profit. In addition, the amounts claimed are unreasonable and excessive.
OPINION Petitioners claimed losses of $ 58,923 for 1981 and $ 80,647 for 1982 with respect to payments made for Cheryl Krebs' activities with Citizens Band. Respondent contends that the deductions are not allowed because they were not incurred for an activity engaged in for profit under section 183(a). Petitioners also claimed losses under sections 162 and 165 with respect to petitioner's projects Profiles in Shame, Rockworld, America Live, Soho News, and Cosmic Muffin. Remaining at issue with respect to the projects are $ 30,163 for 1981 and $ 500 for 1982. Respondent contends that the expenses were not substantiated or *178 sufficiently connected to the stated ventures. Respondent asserts that petitioner did not have the requisite profit motive when making the expenditures. Respondent also argues that they were investigatory, and thus not subject to deduction under sections 162 and 165. Respondent asserts that they were capital expenditures at best. 1. Cheryl Krebs and Citizens Band
a. Actual and Honest Profit Objective
Respondent argues that petitioners' deductions with respect to Cheryl Krebs and Citizens Band must be disallowed because the activity was not engaged in for profit. We must decide whether petitioners' activities with respect to Cheryl Krebs' music career were activities not engaged in for profit by petitioners within the meaning of section 183. If so, petitioners are allowed deductions attributable to Cheryl Krebs' music career to the extent of gross income earned from such activity, sec. 183(b)(2), and deductions which are allowable without regard to whether the activity was engaged in for profit. Sec. 183(b)(1). An activity not engaged in for profit is any activity other than one for which deductions are allowable for the taxable year under section 162 or under *179 paragraph (1) or (2) of section 212. Sec. 183(c). Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The test for determining whether a taxpayer is carrying on a trade or business pursuant to section 183 is whether the taxpayer is engaged in the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). While a reasonable expectation of profit is not required, petitioner's profit objective must be bona fide. Engdahl v. Commissioner, supra; Golanty v. Commissioner, supra at 425-426; Allen v. Commissioner, 72 T.C. 28, 33 (1979). Whether petitioners had an actual and honest profit objective in pursuing Cheryl Krebs' music activities is an issue of fact *180 to be resolved on the basis of all of the facts and circumstances. Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. We give greater weight to the objective facts than to petitioners' mere statement of intent. Dreicer v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proving that they possessed the requisite profit objective. Rule 142(a); Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. at 644-645; Golanty v. Commissioner, supra.In this context, "profit" means economic profit, independent of tax savings. Herrick v. Commissioner, 85 T.C. 237, 255 (1985); Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Surloff v. Commissioner, supra.
Respondent argues that petitioner's profit objective with respect to Cheryl Krebs' music activities may not be considered by this Court, and that even if petitioner's objective was relevant, his activities with respect to Cheryl Krebs were not for profit. We disagree. Respondent *181 cites Rodgers v. Commissioner, T.C. Memo. 1979-128, in support of the theory that profit objective can only be attributed to the individual directly engaged in the activity. Rodgers is distinguishable from the instant case. In Rodgers, the taxpayer spouses each claimed to be separately engaged in the same trade or business of being actors and entertainers. The Court found insufficient evidence as to the taxpayer wife's activities, and thus reached a different result from her husband. In this case, both petitioners were participating in the same activity. Petitioner was the manager and financial backer, while Cheryl Krebs wrote, rehearsed, performed, and recorded. Petitioner and Cheryl Krebs were married during the years at issue. Petitioner paid the expenses that respondent disallowed as deductions. Respondent seems to place inordinate importance on the form of the caption appearing on the Schedule C, even though petitioners filed a joint return. We are persuaded that petitioner's objective is relevant since he paid the expenses that respondent disallowed. We are also persuaded that petitioner had an actual and honest objective of making a profit *182 on Cheryl Krebs' music activities. Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. They include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, supra; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). (1) Manner in Which the Taxpayers Carried on the Activity
We are persuaded that petitioners *183 carried on Cheryl Krebs' music activities in a businesslike and professional manner. Cheryl Krebs' music acitivities were her full-time job. Although Cheryl Krebs was petitioner's wife, petitioner and Cheryl Krebs used methods similar to those used with petitioner's other music acts, successful and unsuccessful. Petitioner employed only professional musicians who viewed Citizens Band as their fulltime employment. Petitioner paid the professional musicians and support people to rehearse and otherwise prepare the group for a recording contract. Petitioner obtained a high quality photographer for promotional work. Petitioner also ran a trademark search on the name Citizens Band. They used top recording studios for demonstration or demo recordings. Ultimately, they sought and received a recording contract with CBS. When CBS declined to exercise its option, Citizens Band was abandoned. A change of operating methods or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may indicate a profit objective. Pirnia v. Commissioner, T.C. Memo. 1989-627; sec. 1.183-2(b)(1), Income Tax Regs. Similarly, the speed with *184 which a taxpayer ceases operations of an activity when he determines that they will not be profitable is an important factor evidencing his profit objective. See Feldman v. Commissioner, T.C. Memo. 1988-126. (2) Taxpayers' Expertise
"Efforts at gaining experience and a willingness to follow expert advice should * * * be considered" in determining profit objective. Nickerson v. Commissioner, 700 F.2d 402, 407 (7th Cir. 1983), revg. T.C. Memo. 1981-321. Similarly, preparation for an activity by extensive study of its accepted business, economic, and scientific practices, and consultation with those who are expert therein, indicates that the taxpayer entered into the activity for profit. Pirnia v. Commissioner, supra; sec. 1.183-2(b)(2), Income Tax Regs.
Respondent faults petitioners for not engaging other experts to evaluate Cheryl Krebs and the Citizens Band. Petitioners contend that petitioner did his own evaluating, and thus was in a sense his own expert. We agree with petitioners. Petitioner primarily undertook projects with previously unsuccessful acts with what he believed to have the *185 potential to make it big. He was successful in his line of work. Cheryl Krebs was not as successful as petitioner in her endeavors. She was involved in music and performing arts from an early age. She devoted her adult life toward her goal of becoming a successful recording artist. We believe that she had sufficient expertise from which we may draw an inference that this factor favors petitioners. We also believe that she relied on her husband's expertise in this area. (3) Taxpayers' Time and Effort
Respondent argues that petitioners did not spend much time and effort with Cheryl Krebs' music career. Respondent points to petitioner's testimony that he spent 10 percent of his time on Cheryl Krebs and the Citizens Band. Respondent also notes that using what respondent alleges to be industry standard costs for studio time of $ 200 per hour, Cheryl Krebs only spent 55 hours in the studio rehearsing and recording. Petitioners counter that petitioner also testified that he typically worked 80 hours per week or 4,160 hours per year. As to Cheryl Krebs, petitioners point to testimony that the actual studio rates paid were $ 20 per hour for rehearsal studios and $ 55 per hour *186 for recording. These special rates were obtained because of petitioner's statute in the business. Also, the discounted recording rates included a percentage of royalties that Cheryl Krebs and Citizens Band may earn in the future. On the record before us, we are persuaded that both petitioners spent substantial time and effort on this project. (4) Expectation of Appreciation in Value
Respondent asserts that this factor is inapplicable because there were no assets involved. Although this is not the type of asset typically contemplated by section 1.183-2(b)(4), Income Tax Regs., we note that petitioners believed that if their efforts were successful in making Cheryl Krebs a recording star, their return would be many times their original investment. (5) Taxpayers' Success in Other Activities
Overall, when petitioner and Cheryl Krebs began working together on Cheryl Krebs' recording career, petitioner had been successful in his endeavors in managing and promoting rock and pop acts, while Cheryl Krebs had not achieved commercial success. Respondent emphasizes Cheryl Krebs' lack of success while arguing that we may not look at petitioner's track record. We disagree. Cheryl *187 Krebs' lack of financial success when the project began should not necessarily be considered a negative factor in this regard because most of petitioner's acts were unsuccessful when he began working with them and investing in them. We are persuaded that petitioner saw sufficient potential in Cheryl Krebs that he invested his time, energy, and money in her singing career. Respondent concedes in his opening brief that petitioner was "a successful and highly regarded rock promoter when he married Mrs. Krebs and during the years in issue." (6) Taxpayers' Income and Loss History
A history of losses may indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, the objective to make a profit may exist even in the face of a history of losses unaccompanied by any gains. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). "The presence of losses in the formative years of a business * * * is not inconsistent with an intention to achieve a later profitable level of operation". Id.
An opportunity to earn a substantial ultimate profit in a highly speculative *188 venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though only losses are generated. Sec. 1.183-2(b)(7), Income Tax Regs.
Petitioners' losses were incurred in the startup stage of a very competitive and speculative business. The losses sustained by petitioners were not sustained for a period beyond that which is reasonably necessary for a female recording artist to achieve profitable status. (7) Amount of Occasional Profit
This project had the all-or-nothing objective of making Cheryl Krebs a successful recording artist. As such, there was no occasional profit. On the other hand, as respondent concedes, petitioner generated substantial income from his activities. (8) Taxpayers' Financial Status
Petitioners had the means to absorb the losses. (9) Personal Pleasure or Recreation
The fact that the taxpayer derived personal pleasure from the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is, in fact, engaged in for profit as evidenced by other factors. Pirnia v. Commissioner, supra; sec. 1.183-2(b)(9), Income Tax Regs.
Petitioners derived *189 personal pleasure from Cheryl Krebs' music activity. We do not believe that business and pleasure are mutually exclusive. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); Nichols v. Commissioner, T.C. Memo. 1990-546; Green v. Commissioner, T.C. Memo. 1989-599; Barton v. Commissioner, T.C. Memo. 1980-179; McDonell v. Commissioner, T.C. Memo. 1967-18. We note that a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been a prerequisite to deductibility. Jackson v. Commissioner, supra.Green v. Commissioner, supra.The type of things the taxpayer does, the times of day, and the number of hours engaged may support the conclusion that the activity is not purely for pleasure or a hobby. See Faulconer v. Commissioner, 748 F.2d 890, 898 (4th Cir. 1984), revg. T.C. Memo. 1983-165; Mary v. Commissioner, T.C. Memo. 1989-118. b. Payments Made Through CCC
Respondent notes that Cheryl Krebs' expenses were paid primarily by *190 CCC. Thus, respondent argues that CCC should be the party claiming the deductions and not petitioners. Respondent further asserts that if CCC made the payments, which were personal in nature, then the payments are constructive dividends to petitioners. We are persuaded that although the payments were made through CCC, they were actually made by petitioner. Clearly, petitioner used CCC's reputation for the advantage of Cheryl Krebs and Citizens Band. However, it is also clear that Leber permitted petitioner to run the expenses related to Cheryl Krebs and Citizens Band through CCC with the agreement that the payments would be deducted from petitioner's share of CCC. c. Substantiation
Respondent contends that the claimed expenses are not adequately substantiated. We are satisfied that petitioners have adequately substantiated their claimed expenses with respect to Cheryl Krebs' music activities. d. Conclusion
We do not adopt respondent's characterization of a rich husband indulging his wife. Rather we conclude that petitioner subsidized the costs of Cheryl Krebs' and Citizens Band's music activities as their personal manager as he did with his other bands. 2. *191 Petitioner's Ventures
Petitioners contend that petitioner's checks written for his ventures were ordinary and necessary business expenses of petitioner's ongoing business under section 162(a) or ordinary losses under section 165. Petitioners alternatively argue that they are entitled to amortize the expenses under section 195. Respondent argues that petitioners are not entitled to deductions for the five ventures because: (1) The expenses are not a part of petitioner's business of managing and promoting rock artists; (2) the expenses are not connected with the claimed ventures; (3) there is insufficient evidence that the losses occurred in the year claimed; (4) the expenses were preopening investigatory expenses incurred in search for a prospective business; (5) the payments were contributions to CCC's capital; and (6) there is insufficient substantiation. Petitioners argue that the ventures were a part of petitioner's business, thus the expenses are not preopening investigatory expenses. We disagree with petitioners as to Profiles in Shame, SoHo News, and Cosmic Muffin. Although we believe that petitioner was an entrepreneur in the rock and pop entertainment field, Profiles *192 in Shame, SoHo News, and Cosmic Muffin constituted new side business. They were sufficiently different from petitioner's livelihood as a manager or promoter of rock and roll acts. Section 162(a) allows a deduction for ordinary and necessary expenses of carrying on a trade or business. In order for expenses to be deductible under section 162, the expenses must relate to a trade or business functioning at the time the expenses are incurred. Hardy v. Commissioner, 93 T.C. 684, 687 (1989), affd. in part and remanded in part per order (10th Cir., Oct. 29, 1990). We have held that "expenses in respect of a preliminary search for a potential business opportunity would not qualify for deductions under sections 162, 165, or 212". Dean v. Commissioner, 56 T.C. 895, 902 (1971). See also Frank v. Commissioner, 20 T.C. 511, 513-514 (1953) (taxpayer expenses in search of a business not deductible under predecessor sections to sections 162, 165, and 212). Petitioner was not in the book publishing business. Petitioners point to the Almanac. However, the Almanac was a book about rock and pop entertainment, which was petitioner's *193 business. Political writing is factually distinguishable. Likewise, petitioner was not involved in newspaper publishing or astrological radio. Petitioners argue that petitioner was involved in the productions of Beatlemania and Jesus Christ Superstar which were not typical rock productions. We believe that Beatlemania and Jesus Christ Superstar are more closely related to rock and pop entertainment than Profiles in Shame, SoHo News, and the Cosmic Muffin. The latter activities are sufficiently different from petitioner's trade or business that petitioner's expenditures made and claimed as losses were startup expenses. We reject the notion of a generic entrepreneur with all enterprises being a part of an ongoing business. We are not persuaded of a history of similar endeavors by petitioner as claimed by petitioners. Accordingly, we hold that the expenses related to Profiles in Shame, SoHo News, and the Cosmic Muffin are not deductible under sections 162 and 165 because they were investigatory expenses incurred in connection with the search for a prospective business. Dean v. Commissioner, supra at 902; Frank v. Commissioner, supra at 513. *194 Petitioners alternatively argue that they are entitled to amortization under section 195. However, they have failed to show that they made a proper election under that section, and are therefore not entitled to that benefit. See Pino v. Commissioner, T.C. Memo. 1987-28. Rockworld and America Live directly involved petitioner's trade or business. Respondent argues that Rockworld was a CCC venture. We disagree. Respondent points to the proposed agreement between Noyes and petitioner addressed to him at Leber Krebs, Inc., dated April 15, 1981. However, this document was not executed. Moreover, on June 24, 1981, Noyes signed a written release to petitioner personally. The $ 8,000 of payments to Noyes was made by petitioner's personal checks. Respondent argues that petitioner's checks payable to Mr. Hilley did not make any reference to Rockworld. However, petitioner's check number 601 dated May 21, 1981, included Rockworld in the memo. Mr. Hilley was Rockworld's attorney. We are persuaded that Rockworld was petitioner's project and not that of CCC. Finally, we are persuaded that Rockworld became worthless in 1981. Following the release and consulting *195 payments, all payments and activity ceased in 1981. Similarly, respondent argues that any proprietary interest of America Live recordings belonged to CCC and Leber Krebs, Inc. The record includes documents involving CCC and Leber Krebs, Inc., but no indication of who owns the America Live recordings. The checks paid to Pappalardi are petitioner's personal checks. The checks include the memo "A Live". On balance, we conclude that the album project was petitioner's personal project. Respondent further argues that petitioners have failed to prove that the America Live loss was sustained in the year of the deduction as required by section 1.165-1(d)(1), Income Tax Regs. Respondent acknowledges that a loss was sustained, but argues that the transaction was not closed and completed due to the existence of a claim against the telephone company. This argument is refuted by the fact that the album project was not affected by the telephone technical difficulties. Respondent argues that the America Live recordings were doomed from the onset and that petitioner knew that they could not succeed. In support of this theory, respondent points to a newspaper article that reported technical *196 problems that severely impaired sound to the participating radio stations. However, that article describes the problem as a mistakenly pulled telephone circuit that caused noise during the first 28 minutes of broadcast. In addition, the article reported that 30 more stations had planned to run a tape of the show on the following day (Election Day), but the technical problems spoiled that tape. The article also reports that an album was planned, and recordings for that project were unaffected by the technical malfunction. Respondent further argues that the transaction was not closed and completed due to the existence of a claim against AT&T. However, the claim against AT&T related to the broadcast problems, and not the live recording. We conclude that respondent's theories as to America Live are without merit. 3. Addition To Tax for Late Filing of Return
Respondent determined an addition to tax under section 6651(a)(1) for late filing of a return. Petitioners filed their return for 1981 on January 31, 1983. Petitioners admit filing their 1981 return late; however, they argue that petitioner discovered some of the documentation for the return was missing. Section 6651(a)(1) *197 imposes an addition to tax for the unexcused late filing of a return of 5 percent of the amount of the tax due for each month late, up to a maximum of 25 percent. Section 6651(a)(1) also provides that the addition is not applicable if the lateness is due to reasonable cause and not due to willful neglect. We are not persuaded that the vaguely described missing papers constitute reasonable cause under section 6651(a)(1). Accordingly, we hold that petitioners are liable for the addition to tax for late filing under section 6651(a)(1). Decision will be entered under Rule 155.