T.C. Memo. 2000-127


UNITED STATES TAX COURT


HAROLD W. AND JULIA A. KAHLA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12318-97.                    Filed April 10, 2000.


<u>Daniel S. Parks</u> and <u>W. McNab Miller III</u>, for petitioners.

<u>Roberta L. Shumway</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>: Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1992 | $41,815 |
| 1993 | 83,435 |
| 1994 | 79,173 |

These deficiencies stem from respondent's disallowance of certain deductions and losses attributable to petitioners' cattle-raising and deer operations (sometimes referred to as petitioners' Schedule F activities)[1] conducted during the years in issue. Petitioners' Schedule F activities were conducted at two different locations: Buckview Ranch (the North Ranch), which is located in Leon County, near Centerville, Texas, and El Squato Ranch (the South Ranch), which is located in Wells County, near Encinal, Texas.

The issue for decision is whether petitioners' Schedule F activities were activities engaged in for profit. We hold they were not.[2]

All section references are to the Internal Revenue Code as in effect for the years in issue.

---

[1] The parties stipulated that the cattle-raising and deer operations constitute one activity.

[2] During the course of trial preparation, respondent's counsel discovered that certain labor and fuel costs claimed on petitioners' 1992-94 returns as expenses were capital in nature and should have been depreciated rather than expensed. Thereafter, respondent filed an amendment to answer asserting that if petitioners should prevail in their position that the cattle-raising and deer operations were activities engaged in for profit, then deficiencies would still be due, but in lesser amounts, for the years in issue as a result of petitioners' misclassification of the labor and fuel costs. Petitioners apparently do not dispute respondent's assertion in this regard. In any event, in view of our holding that petitioners' Schedule F activities were not activities engaged in for profit, this matter goes by the wayside.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulations of facts and the exhibits submitted therewith are incorporated herein by this reference.

### Background

Petitioners, husband and wife, resided in Tomball, Texas, at the time they filed their petition.

Harold Kahla (petitioner) received a bachelor of business administration degree in marketing and management in 1961; he subsequently attended law school but did not graduate.  Julia Kahla (Mrs. Kahla) received a bachelor of arts degree in speech communication; she later earned a master's degree in education.

During the years in issue, petitioners were the sole shareholders of United Galvanizing, Inc. (United), a Texas corporation. For Federal income tax purposes, United is an S corporation.  Since its inception in 1970, United has operated at a profit.  For the years in issue, United's income was as follows:

| Year | Amount |
|------|--------|
| 1992 | $45,174 |
| 1993 | 235,410 |
| 1994 | 224,221 |

### The North Ranch

The North Ranch is approximately 100 miles from petitioners' home in Tomball.  It comprises approximately 1,223 acres.  The land was acquired, in substantially undeveloped condition, as follows:

| Date | Acres | Acquisition Price |
|------|-------|-------------------|
| 5/73 | 188.070 | $52,659.60 |
| 4/75 | 142.000 | 117,000.00 |
| 1977 | 7.000 | By adverse possession |
| 12/77 | 150.000 | 67,500.00 |
| 12/78 | 530.000 | 198,750.00 |
| 4/83 | 44.487 | By exchange |
| 9/86 | 161.380 | 116,647.93 |
| Total | 1,222.937 | 552,557.53 |

The ranch has 507 acres of improved coastal Bermuda grass pastures for hay production and cattle grazing, and approximately 100 acres of open native pasture land. The balance of the ranch is dense-to-scattered woods. The ranch is fenced into separate pasture areas, allowing for pasture rotation for either cattle grazing or hay production. When fully operational, the North Ranch can sustain up to 400 cows at any given time. Several buildings, including a 4,792-square-foot home, an equipment shed, and ranch offices, are located on the property. The value of the acreage making up the North Ranch during 1992, 1993, and 1994 was $1,225,000. The value of the house and improvements on the North Ranch during 1992, 1993, and 1994 was $85,000.

In order to receive cost-sharing payments from the U.S. Department of Agriculture (USDA), petitioners consulted with the Soil Conservation Service for technical assistance regarding land management matters on the North Ranch. Between 1976 and 1996, petitioners received payments from USDA totaling approximately $22,000.

Petitioners spent a considerable amount of time on the North Ranch each year.  Besides using the North Ranch for their cattle ranching, petitioners regularly entertained family members on holiday occasions, and petitioner frequently hunted on the property.

The South Ranch

The South Ranch is located approximately 320 miles from petitioners' home.  During the years in issue, it comprised approximately 3,578 acres.[3]  The land was acquired as follows:

| Date | Acres | Acquisition Price |
|------|-------|-------------------|
| 9/88 | 1,073.47 | $354,245.10 |
| 11/88 | 648.14 | 213,886.20 |
| 2/89 | (31.57) | [1](10,418.00) |
| 4/89 | 1,169.54 | 409,339.00 |
| 10/89 | 500.00 | 200,000.00 |
| 12/92 | 218.00 | 65,400.00 |
| Total | 3,577.58 | [1]1,232,452.30 |

[1]  Petitioners sold 31.57 acres in February 1989.

The South Ranch is essentially a large pasture suitable for cattle grazing and is located in an area that is subject to drought.  In addition to its large open grazing areas, the South Ranch contains several buildings and fixtures, including a large residence and two "outbuildings".  The residence is often used by petitioners both as a personal retreat and as lodging for visiting guests.  The outbuildings are primarily used to house farm

[3]  An additional 438.66 acres was acquired on Feb. 13, 1997, for $153,673.

equipment and supplies. The value of the acreage making up the South Ranch as of May 11, 1992, was $1,270,500. The value of the house and improvements on the South Ranch as of May 11, 1992, was $70,000. The value of the acreage making up the South Ranch in 1993 and 1994 was $1,442,000. The value of the house and improvements on the South Ranch in 1993 and 1994 was $90,000.

During the years in issue, petitioners spent a considerable amount of time on the South Ranch. They fished and hunted on the property. In addition, since 1987, they escorted family members across the South Ranch on guided hunts.

Petitioners' Cattle-Raising Operations

Petitioner had a lifelong interest in cattle ranching. He was raised on his parents' cattle ranch, where he gained practical knowledge in raising and breeding cattle. Petitioner began his own cattle-ranching activities when he purchased nine cows and one bull in 1973; by 1994, petitioners owned over 300 head of cattle.

Petitioners bred and raised cattle. Cattle deemed surplus were sold at biannual cattle auctions. The following numbers and types of cattle were sold at auction:

| Year | Calves | Cows | Bulls |
|------|--------|------|-------|
| 1992 | 75  | 0   | 4 |
| 1993 | 280 | 68  | 7 |
| 1994 | 28  | 6   | 1 |
| 1995 | 119 | 35  | 3 |
| 1996 | 255 | 133 | 0 |
| 1997 | 98  | 6   | 0 |

Initially, petitioner did most of the chores around the North Ranch. As their operations grew, petitioners hired contract labor. In addition, during the years in issue, two employees of United (Jerry Scott and Perfecto Delgado) worked as caretakers on both ranches. Although paid by United, petitioners claimed Messrs. Scott's and Delgado's salaries as Schedule F expenses.

From the inception of their cattle-raising operations, petitioners' Schedule F expenses exceeded income; this result is expected to continue for the foreseeable future. (Petitioners incur a net loss of approximately $11.85 for every head of cattle sold.) Petitioners attribute these continued losses to fluctuating cattle and feed prices due in large part to increased competition in the industry as well as a prolonged drought.[4]

Deer Operations

In 1988, petitioner decided to raise and manage deer so that he could eventually develop a herd suitable for trophy game hunting. For this purpose, petitioners acquired the South Ranch and enclosed the property with deer-proof fencing. In addition, petitioners installed a water and feed system across the South Ranch in order to ensure a constant supply of food for the deer.

Although petitioner had an extensive knowledge of deer from previous hunting trips, he sought advice from the Texas Parks and

---

[4] We note that during 1992 through 1994, prolonged drought conditions did not exist in the areas surrounding the North and South Ranches.

Wildlife Department on how to manage and feed herds of deer. Additionally, petitioner had aerial surveys made of roaming deer herds in order to observe the herds' development. Petitioners' son, Byron, was employed full time to manage their deer operations; his salary was paid by United.[5]

Petitioner initially planned to conduct guided trophy hunting expeditions on the South Ranch. Petitioner estimated that when fully operational, these hunts would generate a net income stream of $38,600 per year. During the years in issue, petitioner had not begun conducting these guided hunting expeditions on the South Ranch because of the lack of trophy bucks on the property. According to petitioner, it takes on average 4-1/2 years from the beginning of a breeding program for a fawn to develop into a mature trophy buck.

Petitioners' General Financing and Accounting Practices

Petitioners' cattle-raising and deer operations are leveraged. At the time of trial, petitioners owed between $130,000 and $150,000 of debt incurred in operating both ranches.

During the years in issue, petitioners did not maintain

---

[5] During the years in issue, Byron Kahla was paid the following amounts by United:

| | |
|------|----------|
| 1992 | $33,837 |
| 1993 | 226,969 |
| 1994 | 205,825 |

Petitioners did not claim Byron Kahla's salary as a Schedule F expense.

accounting books and records for their Schedule F activities.  Nor did they keep formal business plans, forecasts, budgets, or "herd" books for the cattle-raising or deer operations.

For purposes of calculating their Schedule F income or loss, petitioners did not allocate revenue and expenditures between the two ranches.  Petitioners reported the following Schedule F income and deductions from their activities conducted at the North and South Ranches:

| Year | Revenues | Sales of Property | Deductions | Gain/Loss |
|------|---------|-------------------|-----------|-----------|
| 1976 | $192 | -0- | $33,261 | $(33,069) |
| 1977 | 4,949 | -0- | 27,448 | (22,499) |
| 1978 | 9,414 | -0- | 34,419 | (25,005) |
| 1979 | 15,353 | -0- | 35,139 | (19,786) |
| 1980 | -0- | -0- | 43,393 | (43,393) |
| 1981 | 33,737 | -0- | 67,398 | (33,661) |
| 1982 | 1,873 | -0- | 55,116 | (53,243) |
| 1983 | 21,394 | $1,337 | 86,032 | (63,301) |
| 1984 | 40,368 | -0- | 64,025 | (23,657) |
| 1985 | -0- | -0- | 77,811 | (77,811) |
| 1986 | 41,107 | -0- | 76,636 | (35,529) |
| 1987 | 53,110 | 17,538 | 66,775 | 3,873 |
| 1988 | 49,462 | 839 | 74,973 | (24,672) |
| 1989 | 49,795 | -0- | 195,063 | (145,268) |
| 1990 | 54,752 | -0- | 258,441 | (203,689) |
| 1991 | 7,475 | 16,648 | 310,548 | (286,425) |
| 1992 | 33,451 | 3,366 | 245,319 | [1](210,894) |
| 1993 | 100,835 | 4,074 | 263,289 | (158,380) |
| 1994 | 14,599 | 3,414 | 202,550 | (184,537) |
| 1995 | 46,567 | 13,501 | 192,036 | (131,968) |
| 1996 | 80,294 | 15,598 | 152,295 | (56,403) |
| 1997 | 41,021 | 2,419 | 96,807 | (53,367) |
|  | 699,748 | 78,734 | 2,658,774 | (1,882,684) |

[1]  A computational error was made in determining petitioners' net loss for 1992.

Petitioners' 1992-94 Federal Income Tax Returns

Petitioners timely filed their 1992, 1993, and 1994 Federal income tax returns. On their returns, petitioners reported income from various sources, as follows:

| Year | Compensation | Interest | Schedule C | United |
|------|------|------|------|------|
| 1992 | $97,089 | $300,035 | $126,500 | $45,174 |
| 1993 | 409,596 | 162,391 | --- | 235,410 |
| 1994 | 387,786 | 6,007 | --- | 224,221 |

Petitioners offset this income with the following Schedule F losses attributable to their cattle-raising and deer operations:

| Year | Schedule F Net Loss |
|------|------|
| 1992 | $211,868 |
| 1993 | 162,454 |
| 1994 | 187,951 |

OPINION

The issue we must decide is one of fact: whether petitioners entered into or carried on their Schedule F activities with an intent to make a profit. If petitioners did not have the requisite profit motive, as respondent maintains, then all deductions exceeding the revenue attributable to those activities would be disallowed pursuant to section 183(a).

Respondent contends that petitioners lacked the requisite intent to make a profit in carrying out their Schedule F activities. In support of this position, respondent maintains (1) petitioners failed to carry on the activities in a businesslike manner, (2) the activities generated substantial losses over an

extended period of time (26 years), and (3) there was no realistic expectation that petitioners' Schedule F activities would be profitable.

On the other hand, petitioners maintain that they entered into their Schedule F activities with the intent of making a profit. Petitioners dispute respondent's assertion that they failed to execute their Schedule F activities in a businesslike manner. Further, they assert that despite decades of losses from their Schedule F activities, these losses represent startup period losses and were attributable to unforeseen circumstances (i.e., drought and fluctuating cattle prices). For the reasons set forth below, we agree with respondent.

We begin our analysis with the applicable statutory provisions. Generally, under section 183(a), individuals are disallowed deductions attributable to an activity "not engaged in for profit" except to the extent of any gross income generated by such activity. Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212". Accordingly, section 183 is considered in pari materia with sections 162 and 212. See sec. 1.183-2(a), Income Tax Regs.

The standard for determining whether an expense is deductible under sections 162 and 212 (and thus section 183) is identical: a

taxpayer must show that he or she engaged in or carried on the activity with an actual and honest objective of making a profit. See Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 686 (1988); Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); sec. 1.183-2(a), Income Tax Regs.  Although a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide.  See Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Beck v. Commissioner, 85 T.C. 557, 569 (1985). "Profit" for purposes of section 183(a) means "economic profit, independent of tax savings".  Ronnen v. Commissioner, supra at 92; Hillman v. Commissioner, T.C. Memo. 1999-255.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit.  These factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are controlling.  No single factor is necessarily

dispositive; rather, the facts and circumstances of the case ultimately control. See Keanini v. Commissioner, 94 T.C. 41, 47 (1990).

We now apply each of these factors to the facts in this case.

1. Manner of Carrying on the Activity

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(b)(1), Income Tax Regs. Adapting new techniques and abandoning methods that are economically inefficient may also support the conclusion that the taxpayer possessed the requisite profit motive. See Allen v. Commissioner, 72 T.C. 28, 35 (1979).

Here, the record is replete with instances where petitioners did not conduct their cattle-raising and deer operations in a businesslike manner. Petitioners had no formal business plan, budgets, or accounting records. Petitioners' records and expense ledgers consisted primarily of canceled checks, invoices, and Forms 1099. These records were often inaccurate and incomplete. For instance, petitioner often "forgot to put a couple thousand dollars worth of cattle in his balance sheets". Moreover, petitioners were unable to allocate specific costs between their two ranches because of their practice of aggregating expenses from both ranches.

Petitioners also failed to keep separate bank accounts; they

intermingled personal funds with those from their Schedule F activities. Additionally, despite the industry custom of maintaining yearly "herd books" for cattle, petitioners often failed to record and maintain accurate documentation of their inventory.

Despite experiencing losses in 24 of the first 25 years of operation (1973-97), there is no convincing evidence in the record indicating that petitioners undertook substantial action to rectify this situation. In fact, petitioner testified that he anticipates petitioners' cattle-raising activities will not be profitable for the foreseeable future. Even with this stark economic reality facing them, petitioners have not seriously investigated the possibility of changing or abandoning any of their current methods of operation. Suffice it to say, we believe that petitioners' failure to take affirmative measures to mitigate continual and substantial losses is inconsistent with operating an activity with a profit motive.

## 2. Expertise of Taxpayer or Advisers

Preparation and execution of an activity after conducting an extensive study or consultation with experts regarding the accepted business practices of the activity may indicate a profit motive where the taxpayer conducts the activity in accordance with such study or advice. See sec. 1.183-2(b)(2), Income Tax Regs. Conversely, a taxpayer's failure to obtain expertise in the

activity may indicate a lack of profit motive. See <u>Burger v. Commissioner</u>, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523.

Petitioner grew up on his parents' cattle ranch; he learned firsthand the basics of raising and breeding cattle. He spent considerable time consulting with the USDA Soil Conservation Service, as well as State game and wildlife agencies. In addition, he is an experienced deer hunter. Consequently, he possessed a substantial level of expertise regarding cattle and deer.

However, the fact that petitioner had knowledge of cattle and deer, and that technical noneconomic experts were consulted, does not indicate that petitioners engaged in their cattle-raising and deer operations for profit. See <u>Hillman v. Commissioner</u>, <u>supra</u>. Considering all the years of losses, petitioners did little to demonstrate an expertise for the economics of these operations.

### 3. Time and Effort Expended in the Activity

The fact that a taxpayer devotes much of his or her personal time and effort in carrying on an activity, particularly if the activity does not have substantial recreational aspects, may indicate a profit motive. See sec. 1.183-2(b)(3), Income Tax Regs.

Petitioner spent approximately 40 percent of each year on both ranches; Mrs. Kahla spent approximately 10 percent. The record does not indicate the proportion of time spent on each ranch during the years in issue or the amount of personal effort each expended

in carrying out the Schedule F activities.  However, we are mindful that initially petitioner performed many of the required chores around the North Ranch.  At the same time, however, petitioners used the property for hunting and fishing trips, as well as to entertain guests during the holiday season.  As a result, we are unable to draw an inference regarding the existence of a profit motive solely from how much time and effort petitioners may have expended working on their Schedule F activities.

4.  Expectation That Assets May Appreciate

An expectation that assets used in the activity will appreciate may indicate a profit objective.  See sec. 1.183-2(b)(4), Income Tax Regs.  Accordingly, a profit motive may be inferred where there are no operating profits, so long as the appreciation in value of the activity's assets exceeds its operating expenses of the current year and its accumulated losses from prior years.  See Golanty v. Commissioner, 72 T.C. 411, 427-228 (1979), affd. 647 F.2d 170 (9th Cir. 1981); Sullivan v. Commissioner, T.C. Memo. 1998-367, affd. 202 F.3d 264 (5th Cir. 1999); sec. 1.183-2(b)(4), Income Tax Regs.

Between 1976 and 1997, the amount of accumulated losses from petitioners' Schedule F activities exceeded $1.8 million. Petitioners anticipate that they will continue to incur operating losses from these activities in the near future.

During the years in issue, the value of the North Ranch

exceeded its acquisition costs by \$672,443, and the value of the South Ranch exceeded its acquisition costs by \$38,048 in 1992 and by \$209,948 in 1993 and 1994.  However, the appreciation to date in the North and South Ranches, if and when realized, is substantially less than the cumulative losses from petitioners' Schedule F activities.  Moreover, the parties stipulated that both the North and South Ranches were not acquired for speculative appreciation.

### 5.  Past Success in Other Activities

We have recognized that a taxpayer's success in other business activities may indicate a profit motive.  See Eldridge v. Commissioner, T.C. Memo. 1995-384; Hoyle v. Commissioner, T.C. Memo. 1994-592.  Here, concurrent with the cattle-raising and deer operations, petitioners operated United, a highly profitable business.  When asked at trial what he would have done had United not shown a profit, petitioner candidly responded: "I would have just fixed it."  Yet, with respect to the Schedule F activities, petitioner made little attempt to "fix" the continuation of losses.  Petitioner's apparent tolerance of losses from his Schedule F activities is thus contrary to the position he would have permitted at United and suggests a lack of a profit motive with respect to his cattle-raising and deer operations.

### 6.  History of Income or Losses From the Activity

A history of losses over an extended period of time may indicate the absence of a profit objective.  See Allen v.

Commissioner, supra at 34. Although a long history of losses is an important criterion, it is not necessarily determinative. See Engdahl v. Commissioner, 72 T.C. at 669; Allen v. Commissioner, supra. For instance, a series of startup losses or losses sustained because of unforeseen circumstances beyond the control of the taxpayer may not indicate a lack of profit motive. See Engdahl v. Commissioner, supra; sec. 1.183-2(b)(6), Income Tax Regs.

Petitioners were engaged in cattle raising for nearly 20 years, sustaining losses well past the length of time that can be called the "startup" period.

Petitioners maintain that severe drought and large fluctuations in the price of cattle caused most of their losses. We do not agree with this claim. On the basis of climate and meteorological data from the years in issue, it is apparent that no drought existed in those years. These losses were not unforeseen. Even if it were assumed that drought or fluctuations in the market price of cattle contributed to the losses, petitioner was raised on a cattle ranch in that region of Texas and on the basis of his personal experiences, as well as the advice he received from experts, knew that the region was susceptible to drought and that the price of beef often fluctuated. Petitioners failed to take substantial remedial action to compensate for these conditions which, petitioners apparently claim, existed for nearly 20 years.

Consequently, petitioners' long stream of losses with regard to their cattle-raising and deer operations militates against a finding of profit motive.[6]

### 7.  The Amount of Occasional Profits Earned, If Any

If an activity generates only small, infrequent profits and typically generates large losses, the taxpayer conducting the activity may not have a profit objective.  See <u>Golanty v. Commissioner</u>, <u>supra</u> at 427; sec. 1.183-2(b)(7), Income Tax Regs. In this context, profit means economic profit, independent of tax savings.  See <u>Seaman v. Commissioner</u>, 84 T.C. 564, 588 (1985).

Petitioners' cattle-raising and deer operations achieved a profit only once in more than 20 years.  And the record indicates that losses from these operations will continue for the foreseeable future.

### 8.  Taxpayer's Financial Status

Substantial income from sources other than the activity in question, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit.  See <u>Hillman v. Commissioner</u>, T.C. Memo. 1999-255; sec. 1.183-2(b)(8), Income Tax Regs.

For 1992, 1993, and 1994, petitioners had $572,164, $839,000,

---

[6]  We note that during the years in issue, Byron Kahla's salary was paid by United but not deducted on petitioners' Schedule F.  Had Byron Kahla's salary been deducted as a Schedule F expense, petitioners' Schedule F losses would have been greater.

and $619,611, respectively, in unrelated gross income.  During the same years, petitioners claimed $211,868, $162,454, and $187,951, respectively, in Schedule F losses.  Petitioners used these losses to reduce their gross income by 37 percent for 1992, 19 percent for 1993, and 30 percent for 1994.  These reductions led to substantial tax savings.[7]

### 9.  Elements of Personal Pleasure or Recreation

The existence of recreational elements in an activity may indicate that the activity is not engaged in for profit; on the other hand, where an activity lacks any appeal other than profit, a profit motive may be indicated.  See Hillman v. Commissioner, supra; sec. 1.183-2(b)(9), Income Tax Regs.

Petitioners' recreational objectives were a significant component of their cattle-raising and deer operations.  Petitioner grew up on his parents' cattle ranch, where he often enjoyed the hunting of deer, a passion he was able to continue on his own ranches.  Moreover, petitioners entertained friends and families on both ranches during holiday seasons and other special occasions.

---

[7] Petitioners' cattle-raising activities also enabled them to reduce their State property taxes by as much as 90 percent.  According to one of petitioners' expert witnesses, this tax benefit was available to taxpayers who made land "look like a ranch" solely by placing "a few cows [on the property] whether it is run profitably or not".

Conclusion

Giving due consideration to the record as a whole, we conclude that during the years in issue petitioners did not enter into or carry on their cattle-raising and deer operations with an intent to make a profit.  Accordingly, we sustain respondent's disallowance of petitioners' Schedule F losses.

In reaching our conclusions herein, we have considered all arguments presented and, to the extent not discussed above, find them to be without merit.

To reflect the foregoing,

Decision will be

entered for respondent.